**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN
BANKRUPTCY DIVISION**

_____
In re:                                    )
                                          )
JEFFREY J. PROSSER,                       )        Bankruptcy No. 06-30009 (JKF)
                                          )
        Debtor.                           )        Chapter 7
_____)
JAMES P. CARROLL, CHAPTER 7               )
TRUSTEE OF THE BANKRUPTCY                 )        Adv. Pro. No. 08-3011 (JKF)
ESTATE OF JEFFREY J. PROSSER,             )
                                          )
            Plaintiff,                    )
                                          )
v.                                        )
                                          )
JEFFREY J. PROSSER,                       )
                                          )
            Defendant.                    )
_____)


**MEMORANDUM OPINION[1]**

        Complaints were filed by the Rural Telephone Finance Cooperative ("RTFC"), James P.

Carroll, the Chapter 7 Trustee of the Estate of Jeffrey Prosser (the "Chapter 7 Trustee"), and Stan

Springel, the Chapter 11 Trustee (the "Chapter 11 Trustee," and collectively with the Chapter 7

Trustee and the RTFC, the "Plaintiffs") of the Estates of Innovative Communication

Corporation, Emerging Communications, Inc., and Innovative Communication Company, LLC

---

[1] This Memorandum Opinion constitutes the Court's findings of fact and conclusions of
law.  The headings throughout this Memorandum Opinion are for guidance only.  As such,
whether a conclusion of law or finding of fact appear under either or both headings, the location
of the finding or conclusion within the Opinion is not determinative.  Where the Court makes a
finding of fact or comes to a conclusion of law, each shall have the intended effect regardless of
the headings of the subsections herein.

(collectively, the "ICC Debtors"), seeking the denial of Jeffrey J. Prosser's ("Mr. Prosser" or

"Debtor") discharge pursuant to 11 U.S.C. § 727.[2]  The Plaintiffs allege that Mr. Prosser has,

among other things: (i) failed to disclose to the Chapter 7 Trustee and predecessor examiner

millions of dollars in gifts, transfers, and assets; (ii) failed to cooperate with the Chapter 7

Trustee; (iii) made numerous false oaths and accounts in connection with this bankruptcy case;

(iv) concealed, mutilated, or failed to keep recorded information from which his financial

condition and business transactions might be ascertained; (v) refused to turn over books, records,

and recorded information under an improperly invoked right against self-incrimination; and (vi)

committed numerous acts in violation of § 727(a) in connection with related bankruptcy cases.[3]

Upon agreement of all the parties, the Discharge Adversary Proceedings were

consolidated for purposes of discovery and trial.[4]  Trial on the Discharge Adversary Proceedings

was held on February 1, 2010, and, after resolution of certain appeals, continued on January 30,

---

[2] The *Complaint of Rural Telephone Finance Cooperative Objecting to the Discharge of Jeffrey J. Prosser Pursuant to Section 727 of the Bankruptcy Code* commenced Adversary Proceeding No. 07-3011.  The *Complaint of Chapter 7 Trustee Seeking the Denial of the Debtor's Discharge Pursuant to 11 U.S.C. § 727(a)* commenced Adversary Proceeding No. 08-3011.  Trustee Springel filed two complaints: the *Complaint Objecting to Discharge Under 11 U.S.C. § 727 and to Determine Dischargeability of Debts Under 11 U.S.C. § 523*, filed on behalf of Innovative Communication Corporation, which commenced Adversary Proceeding No. 07-3012, and the *Complaint Objecting to Discharge Under 11 U.S.C. § 727*, filed on behalf of Emerging Communications, Inc., and Innovative Communication Company, LLC, which commenced Adversary Proceeding No. 08-3012.  We will refer to these four adversary proceedings as the "Discharge Adversary Proceedings."

[3] The determination of objections to discharge under § 727 is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).  Thus, the Court has jurisdictional authority to enter a final order and judgment in this matter pursuant to 28 U.S.C. § 157(b)(1).

[4] *See Scheduling Order and Discovery Plan*, Case No. 06-30009, Doc. No. 2578 (the "Discharge Scheduling Order").

2

2012, through February 1, 2012.[5]  The Plaintiffs introduced deposition or trial testimony of

witnesses previously adduced in conjunction with the trials concerning Mr. Prosser's claimed

exemptions (the "Exemptions Trial") and for turnover of certain property (the "Turnover Trial"),

along with other evidence adduced from those trials.[6]  In defense, Mr. Prosser called no live

witnesses, relying also on previously introduced evidence.  Closing arguments were heard on

June 19, 2012.

    This Memorandum Opinion addresses only the Chapter 7 Trustee's complaint.  For the

reasons that follow, we find that the Chapter 7 Trustee has established by a preponderance of the

evidence that the denial of the Debtor's discharge is warranted.  Over the course of these

bankruptcy proceedings, Mr. Prosser has repeatedly failed to honor his obligations as a debtor

and has shown a complete disregard for the orders of this Court.  As such, we shall deny the

Debtor's discharge under 11 U.S.C. § 727(a).  As to the remaining Discharge Adversary

Proceedings, which seek the same relief, we will defer our rulings until this Order becomes

final.[7]

## PROCEDURAL AND FACTUAL BACKGROUND

---

[5]  Greenlight Capital Qualified L.P., Greenlight Capital L.P., and Greenlight Capital Offshore, Ltd. (the "Greenlight Entities" or "Greenlight") also filed a *Complaint Under 11 U.S.C. § 523(a) and 1142(d)(2) to Determine Debt to be Non-Dischargeable*, which commenced Adversary Proceeding No. 07-3001.  Because this action would be rendered moot upon a final order denying discharge under 11 U.S.C. § 727(a), the parties all agreed to reserve the Greenlight Entities' complaint and as such, it was not consolidated with the Discharge Adversary Proceedings.

[6] *See* the *Amended Scheduling Order and Discovery Plan*, Adv. No. 08-3011, Doc. No. 61 (the "Discovery Plan").

[7] If this Order is affirmed on appeal or otherwise becomes final, the remaining Discharge Adversary Proceedings will be moot.

Jeffrey J. Prosser was Chairman of the Board, President, and CEO of of Innovative Communication Corporation ("New ICC"), a management and holding company that owns, directly or indirectly, 100% of the common stock of various operating subsidiaries that provided telephone, newspaper, internet, and other services to the citizens of the U.S. Virgin Islands and surrounding areas.  Mr. Prosser is the sole member of New ICC's parent companies, Innovative Communication Company, LLC ("ICC LCC") and Emerging Communications, Inc. ("ECI" and, together with ICC LLC, the "Parent Debtors").[8]  Trial Ex. TD-206.  At this time, New ICC, ECI, and ICC LLC are each debtors in bankruptcy.[9]

On February 10, 2006, Greenlight filed an involuntary petition for relief against Mr. Prosser, ICC LLC, and ECI under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  *Id.*  On July 31, 2006, before an order for relief was entered in the involuntary cases, Mr. Prosser filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of the U.S. Virgin Islands, commencing Case No. 06-30009 (JKF).[10]  Mr. Prosser's bankruptcy case was later converted to chapter 7, the circumstances of which are discussed in greater detail, *infra.*

As of June 8, 2006, Mr. Prosser and New ICC were jointly and severally liable to the RTFC based on a judgment in the amount of $524,910,065 (the "RTFC Judgment"), for which

---

[8] New ICC and the Parent Debtors shall be collectively referred to herein as the "ICC Debtors," where appropriate.

[9] New ICC's bankruptcy case is at Case No. 07-30012 (JKF).  ECI's bankruptcy case, Case No. 06-30007 (JKF), and ICC LLC's bankruptcy case, Case No. 06-30008 (JKF) are jointly administered at Case No. 06-30008 (JKF).

[10] On the same day, ECI and ICC LLC also filed voluntary petitions in the Virgin Islands. All the involuntary petitions in the Bankruptcy Court for the District of Delaware were subsequently transferred to this Court and consolidated with the voluntary proceedings.

4

Mr. Prosser's personal liability was capped at $100,000,000.[11]  Trial Ex TD-128.

On September 25, 2006, Mr. Prosser filed his original schedules (the "Original Schedules") and Statement of Financial Affairs.  Prosser Exs. 1, 2.  Mr. Prosser amended his schedules on the following dates: February 5, 2007 (the "First Amendment"), February 13, 2007 (the "Second Amendment"), November 30, 2007 (the "Third Amendment"), and January 11, 2008 (the "Fourth Amendment").[12]

### The Exemptions Trial

The Chapter 7 Trustee, Chapter 11 Trustee, and Greenlight each filed objections to Mr. Prosser's claimed exemptions under § 522(b)(3).[13]  This Court held a non-evidentiary hearing on February 28, 2008, at which time it ruled on a number of the objections, and thereafter entered the Order Regarding Objections to Debtor's Claimed Exceptions and Granting Related Relief on March 20, 2008 (the "Exemptions Order").[14]  The remaining objections were tried by the court on June 9-12, 2008, August 25-28, 2008, September 8-9, 2008, and October 2-3, 2008. Closing Arguments were held on December 1, 2008.

On October 9, 2009, the Court issued its "Exemptions Opinion."[15]  This Court found that

---

[11] The RTFC Judgment is described in greater detail in this Court's *Memorandum Opinion Regarding Exemptions Claimed By Debtor*, Case No. 06-30009, Doc. No. 2613, filed October 9, 2009.

[12] Mr. Prosser amended his schedules a fifth time on May 7, 2009 (the "Fifth Amendment"), though the Fifth Amendment was not introduced into evidence and has no effect on the Court's ruling.

[13] Case No. 06-30009, Docs. No. 1143, 1178, 1236, 1237, 1338, 1343, 1344.

[14] Case No. 06-30009, Doc No. 1458.

[15] *Memorandum Opinion Regarding Exemptions Claimed by Debtor*, Case No. 06-30009,
(continued...)

5

Mr. Prosser had: (1) failed to produce material documents, provide necessary access, and cooperate with the court-appointed Examiner, the Chapter 7 Trustee, and the Chapter 11 Trustee for the ICC Debtors; (2) failed to disclose the existence of storage space in West Palm Beach, Florida, containing records and personal property relevant to his bankruptcy; (3) ordered the destruction of computer hard drives located at the Palm Beach Property in an effort to conceal information, records, and documents from the Trustees; (4) failed to disclose and/or continuously delayed disclosure of various assets and liabilities, including hundreds of bottles of wine with an aggregate value in the millions of dollars, a cigar collection with an aggregate value in the thousands of dollars, valuable jewelry, watches, a Bernard Passman chalice, a life insurance policy for which New ICC paid at least $85,000 per year in premiums, the Debtor's interest as an officer in AMJ, Inc., and a $5.65 million obligation the Debtor owed to New ICC for the Palm Beach Property; (6) caused the ICC Debtors and/or their operating entities to pay for millions of dollars of personal items and services utilized or possessed by Mr. Prosser and/or his family that were not disclosed in the Debtor's Monthly Operating Reports and were not included as gross income in his Statement of Financial Affairs; (7) significantly undervalued assets that were listed in his schedules; (8) concealed a marital asset division agreement, a will, and other estate planning documents from the Trustees, (9) failed to disclose $480,000 he transferred to Dawn Prosser on the day of and the day after the filing of his bankruptcy petition.[16]

Based on these facts, the Court found that Mr. Prosser's behavior was clear and

---

[15](...continued)
Doc. No. 2613, filed October 9, 2009.

[16] *Id.*

convincing evidence of his bad faith and blatant disregard of his obligations as a debtor.  This

Court found that the objecting parties had convincingly met their burden of proof.

Consequently, an order denying all exemptions claimed by Mr. Prosser was entered.[17]

 Because it was anticipated that many of the findings of fact litigated in the Exemptions

Trial would be relevant in the Discharge Adversary Proceedings, the Plaintiffs each filed a

motion for summary judgment seeking to prevent certain findings of fact from being re-litigated

in the Discharge Trial on grounds of collateral estoppel, and seeking to have Mr. Prosser's

discharge denied on the basis of those findings.[18]  On January 13, 2010, the Court granted the

Plaintiffs' motion in part, finding that collateral estoppel applied to five findings of fact from the

Exemptions Trial: (1) Mr. Prosser failed to disclose $480,000 he transferred to Dawn Prosser on

the day of and the day after the filing of the bankruptcy petition; (2) Mr. Prosser concealed a

marital asset division agreement, a will, and other estate planning documents; (3) Mr. Prosser

ordered the destruction of computer hard drives located at the Palm Beach Property in an effort

to conceal information, records, and documents from the Trustees; (4) notwithstanding the entry

---

 [17]*Id.*  The Court recognizes that the Exemptions Opinion was later vacated in the United
States District Court for the District of the U.S. Virgin Islands insofar as it denied real property
exemptions for "the Hermon Hill Property, the Estate Shoys Property, and the Anna's Hope
Property."  *Prosser v. Springel,* 3:09-cv-00147-CVG, Doc. No. 39, at 23.  However, Judge
Gomez, in vacating and remanding the Exemptions Opinion, did not disturb this Court's findings
of fact as they related to the Debtor's bad faith conduct.  Judge Gomez ruled only that because
this Court did not tie the Debtor's bad acts to the real property for which Mr. Prosser sought
exemptions, re-examination was needed.  *Id.* at 20-21.  While this Court will re-examine the
merits of Mr. Prosser's claimed exemptions in the Hermon Hill, Estate Shoys, and Anna's Hope
Properties and issue a separate opinion and order regarding same, the factual findings made
during the Exemptions Trial were fully litigated by the parties and remain relevant to the
Discharge Adversary Proceedings at hand.

 [18] *See, e.g., Chapter 7 Trustee's Motion for Summary Judgment*, Adv. Pro. No. 08-3011,
Doc. No. 42.

of an Order to Compel, and despite its clear statement regarding Debtor's duty to do so, Mr.

Prosser did not provide immediate, full, complete and unfettered access to the records of New

ICC; and (5) Mr. Prosser failed to disclose the existence of storage space in West Palm Beach,

Florida, containing records and personal property relevant to the bankruptcy.[19]  However, the

Court declined to deny the Debtor's discharge on summary judgment so that Mr. Prosser would

have the opportunity to offer his defenses to the complaints contesting his discharge at trial.

## DISCUSSION

The Chapter 7 Trustee objects to the Debtor's discharge under § 727(a)(2), (a)(3), (a)(4),

(a)(5), (a)(6), and (a)(7).  Because the acts and conduct of the Debtor warranting a denial of

discharge, as alleged by the Chapter 7 Trustee, overlap somewhat in their applicability to the

various subsections of § 727(a), for purposes of clarity we will set out the Court's findings of

fact with respect to Mr. Prosser's alleged "bad acts" before turning to the legal analysis of §

727(a).

## FINDINGS OF FACT

**1.      Mr. Prosser failed to disclose two transfers, totaling $480,000, made to his wife, Dawn Prosser on the day of and the day after the filing of his bankruptcy petition**

As we found in the Exemptions Opinion, Mr. Prosser failed to identify in his Statements

of Financial Affairs, monthly operating reports, or other bankruptcy filings, two transfers

totaling $480,000 made by him on July 31, 2006, and August 1, 2006.

Mr. Prosser filed his voluntary bankruptcy petition on July 31, 2006.  Item 10 of the

Statement of Financial Affairs requires the following information:

---

[19] *Order Granting in Part and Denying in Part Motions for Summary Judgment in the Discharge Proceedings*, Adv. Pro. No. 08-3011, Doc. No. 63, at 5-6.

> 10.  Other Transfers.  List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case.

Mr. Prosser's answer to Item 10 was "None."  Trial Ex. TE-1.

However, the Court finds that Mr. Prosser failed to disclose two significant transfers to Dawn Prosser.  *Id.*; TD-108 (Trial Test. of James P. Carroll, 52:4-23).  First, on the day of filing, Mr. Prosser transferred $250,000 from a Virgin Islands Community Bank ("VICB") account he held jointly with Dawn Prosser to Account Number 0182603908, which is an account in the name of Dawn Prosser and her daughter, Michelle LaBennett.  Trial Exs. TE-19 (VICB statement dated August 10, 2006, for Account No. 018260567 in the names of Jeffrey and Dawn Prosser); TE-20 (VICB statement dated August 10, 2006, for Account No. 0182603908 in the names of Dawn Prosser and Michelle LaBennett); TD-108 (Trial Test. of James P. Carroll, 69:18-70:11).  The bank statement dated August 10, 2006, for Dawn Prosser's and Michelle LaBennett's account (No. 0182603908) shows a credit of $250,000 on July 31, 2006.  Trial Exs. TE-19; TE-20; TD-108 (Trial Test. of James P. Carroll, 69:18-70:11).

The second transfer, in the amount of $230,000, was made by wire from Mr. Prosser's individual account at Bank of America on August 1, 2006, to the aforementioned account at VICB held by Dawn Prosser and Michelle LaBennett.  Trial Exs. TE-20; TD-108 (Trial Test. of James P. Carroll, 70:12-19); TE-21 (Bank of America statement for Account No. 0034 4113 3533 in the name of the Debtor, covering the period July 31, 2006, through August 14, 2006).[20]

---

[20] In re-examining the record, we note that the transfer of $230,000 was technically posted on Jeffrey Prosser's Bank of America account on the day of filing, at 4:45 PM Eastern time.  Trial Ex. TE-21.  Though the $250,000 transfer made on July 31, 2006 was received by

(continued...)

Mr. Prosser did not disclose either the $250,000 transfer or the $230,000 transfer on his
schedules, his Statement of Financial Affairs, or on his monthly operating report for the relevant
time period, August 1 through August 31, 2006.  Trial Exs. TE-1; TD-10; TD-108 (Trial Test. of
James P. Carroll, 72:5-17, 73:23-74:1); TD-116 (Trial Test. of Stan Springel, 253:12-23).  The
transfers were discovered by the Chapter 7 Trustee upon review of the Debtor's bank statements.
Trial Ex. TD-108 (Trial Test. of James P. Carroll, 68:5-70:19).

Mr. Prosser testified that the two transfers in question related to a settlement check
received from a contractor in the amount of $488,000, which he claims was deposited into the
joint account he held with Dawn Prosser.  Trial Ex. TD-110 (Trial Test. of Jeffrey J. Prosser,
235:11-15, 236:3-17).  The Debtor contends that because the Prossers' residence on St. Croix
known as the "Shoys Estate" is owned by his wife, his wife was entitled to the proceeds from the
settlement check, which was received from the contractor in settlement of a dispute over work
done on the Shoys Estate.  *Id.* at 235:11-236:7.  Mr. Prosser testified that only by coincidence
did the execution of these two transfers of $250,000 and $230,000 occur on the date of and the
date after the filing of his bankruptcy petition.  *Id.* at 243:3-15.

We do not find Mr. Prosser's explanation, that the transfers were made because his wife
was the person entitled to the funds, to be credible.  The evidence establishes two separate

---

[20](...continued)
the VICB account held by Dawn Prosser and Michelle LaBennett on the same day, the $230,000
transfer was not received by the VICB account until the next day, August 1, 2006.  Trial Ex. TE-
20.  As a result, the Plaintiffs have always referred to the $230,000 transfer as having occurred
on August 1, 2006, which the Court will continue to do.  In any event, Mr. Prosser failed to
disclose these transfers, and, as will be discussed in the Conclusions of Law section, whether the
$230,000 transfer is considered to have been made on July 31, 2006, or August 1, 2006, is
ultimately of no consequence to this Court's determination regarding Mr. Prosser's discharge.

transfers to Dawn Prosser totaling $480,000 from two different accounts bearing the Debtor's

name.  This simply does not square with Mr. Prosser's explanation that the transfers represent a

single, $488,000 settlement, received from a contractor, which was originally placed in a joint

account held by the Debtor and his wife.  The total transfer amounts do not match, and, as noted

above, the $230,000 transfer came from an account the Debtor held solely in his own name.

Mr. Prosser filed monthly operating reports for August, September, October, November,

and December 2006 and for January 2007.  Trial Exs. T-10; TE-60; TD-108 (Trial Test. of James

P. Carroll, 70:6-23).  At no point in time did Mr. Prosser disclose to the Chapter 7 Trustee the

transfers of $250,000 and $230,000, or of the total $480,000 that he transferred to his wife.  *Id.*,

at 78:7-11.  The transfers were not disclosed on the Debtor's bankruptcy schedules or any other

pleading or filing despite the fact that the transfers originated from accounts he controlled and in

which the estate has an interest.  Trial Ex. TD-117 (Trial Test. of James P. Carroll, 120:22-

122:4).  On May 7, 2009, after the close of the Exemptions Trial, Mr. Prosser filed an

amendment to his Statement of Financial Affairs, Item 10, adding a $480,000 transfer dated July

31, 2006, to "Dawn Prosser, Wife***."[21]  Mr. Prosser included the following annotation with his

amendment:

> ***$250,000 was transferred from the Virgin Islands Community Bank Account of Mr.
> and Mrs. Prosser. $230,000 was transferred via a wire Transfer from the Debtor's Bank
> of America Account to an account held by Mrs. Prosser.  This is added solely to reflect
> the transfer of funds previously paid to Dawn Prosser in settlement of claims relating to
> her St. Croix residence from one account to 2 other accounts.  This is merely to complete
> the record that money moved between accounts.

Although Mr. Prosser amended his Statement of Financial Affairs to reflect the transfers

---

[21] *See* Case No. 06-30009, Doc. No. 2469.

in question, he did so only after the asset was discovered by the Chapter 7 Trustee, and clearly

had no intention of voluntarily disclosing the existence of these transfers prior to their discovery.

There has been no explanation as to why the $250,000 transferred on July 31, 2006, allegedly

intended to reimburse Dawn Prosser, was made from an account jointly held by Jeffrey and

Dawn Prosser to an account jointly held by Dawn Prosser and her daughter, Michelle LaBennett.

Dawn Prosser was a joint title holder on both accounts.  Furthermore, while Mr. Prosser

characterized the "St. Croix residence" (the "Shoys Estate") as belonging to Dawn Prosser,

based on the credible evidence, this Court has already found that Mr. Prosser holds an equitable

50% interest in the Shoys Estate.[22]  Thus, even if the transfers did relate to a settlement received

in connection with the Shoys Estate construction, the Debtor, and, hence, his bankruptcy estate,

held an interest in the funds in Mr. Prosser's bank accounts.  Mr. Prosser's act of transferring

nearly half of a million dollars out of the bankruptcy estate to his wife, and failing to disclose

those transfers, was done in bad faith and in blatant disregard of his obligations as a debtor.

## 2.    Mr. Prosser concealed a marital asset division agreement, a will, and other estate planning documents from the Trustees

Despite requests from the Trustees for documentation pertaining to any wills or trusts he

had executed, Mr. Prosser failed to produce any such information. Trial Ex. TD-117 (Trial Test.

of James P. Carroll, 100:20-23).  When asked directly at his deposition about the existence of a

will, Mr. Prosser testified, "I don't have a will," and stated that he had never had a will.  Trial

Ex. TD-114 (Deposition of Jeffrey J. Prosser, July 22, 2008, 28:4-7).  Notwithstanding this

testimony, it is clear that the Debtor did, in fact, have a will, as the will itself is admitted into

---

[22] Trial Ex. TD-210 (Turnover Memorandum Opinion and Order, Adv. Pro. No. 07-3010, Doc. No. 728, at 133).

evidence in this proceeding as Trial Exhibit TE-102.  Attorney Donovan Hamm testified that "a

number of years ago," he prepared a will, a revocable trust, and other estate planning documents

that Mr. Prosser executed, and that the original copies were given to Mr. Prosser.  Trial Ex. TD-

116 (Testimony of Donovan Hamm, 82:2-23); TE-102.  Furthermore, attorney Peter Weisman

also testified that he prepared estate planning documents for Mr. Prosser.  Trial Ex. TD-122

(Deposition of Peter Weisman, August 12, 2008, and read into the record on October 3, 2008, at

75:19-76:3).

        Mr. Prosser also concealed an asset division agreement between himself and his wife,

Dawn Prosser (the "Marital Property Agreement"), stating that he had never put any such

agreement with his wife in writing.  Trial Ex. TD-115 (Testimony of Jeffrey J. Prosser, 145:15-

146:21).  This testimony also proved to be false, as the Marital Property Agreement, signed by

both Mr. and Mrs. Prosser and dated January 18, 2006, is now admitted into evidence as Trial

Exhibit TE-90.  Trial Exs. TD-115, 148:7-150:16; TE-90 (Marital Property Agreement, Dated

January 18, 2006).  The Marital Property Agreement was signed only nine days after the

Chancery Court in Delaware issued its opinion regarding the Greenlight litigation, which entered

judgment in favor of Greenlight and against Mr. Prosser and certain of the ICC entities in excess

of $56,000,000 (the "Greenlight Judgment").  Trial Ex. TE-51 (Final Order and Judgment, *In re

Emerging Communications, Inc. Shareholders Litigation,* Civ. A. No. 16415 (Del. Ch. Jan. 9,

2006)).[23]  When confronted by the document, Mr. Prosser testified that he became aware of the

judgment "the day the judgment was entered or shortly thereafter," and entered into the Marital

---

[23] Greenlight is a creditor of the Chapter 7 Estate.  The Chancery Court judgment arose
out of Mr. Prosser's privatization of ECI.

13

Property Agreement with Mrs. Prosser on January 18, 2006.  Trial Exs. TD-115 (Trial Test. of

Jeffrey J. Prosser, 275:21-276:9); TE-90; TE-51.

Mr. Prosser described the origins of the Marital Property Agreement as follows:

[W]hat precipitated [the Marital Property Agreement] is that Dawn was obviously very
uptight and very stressed with that [Chancery Court Opinion], obviously we had spent
20-plus years building, you know.  No one knew what was going to be left.  And she was
obviously concerned about the home that was in her name and the companies in the
Virgin Islands.  And I think that's all that it precipitated was to document what our
understanding was . . .[and that the] lawsuits were in process with RTFC already.  All of
that litigation and, of course, then it was compounded with the Greenlight, what I call the
Greenlight decision.  And so it was without question a very stressful time period for
Dawn, and for me, but certainly more so for Dawn.

Trial Exs. TD-115 (Trial Test. of Jeffrey J. Prosser, 275:6-276:9; 278:17-270:25; 280:1-9); TE-

90 (Marital Property Agreement, Dated January 18, 2006).  Such detailed testimony

notwithstanding, prior to giving this testimony Mr. Prosser denied the existence of the Marital

Property Agreement in his deposition taken in conjunction with the Exemptions Trial.  Trial Ex.

TD-114 (Deposition of Jeffrey J. Prosser, July 22, 2008, 36:17-38:10).  The Chapter 7 Trustee

was not made aware of the Marital Property Agreement's existence until June of 2008, when it

was uncovered by the Chapter 11 Trustee among the documents in a storage shed, the existence

of which was, itself, undisclosed by the debtor.  Trial Ex. TD-117 (Trial Test. of James P.

Carroll, 106:11-22).  Even after Trustee Springel discovered the Marital Property Agreement,

Mr. Prosser refused to produce it until this Court compelled its production at the request of the

Chapter 7 Trustee.  Trial Exs. TD-138; TD-148.

The Marital Property Agreement, executed "for the purpose of defining the separately

owned property of Dawn E. Prosser," is significant because its provisions identify only a limited

number of items that allegedly belong solely to Dawn Prosser.  These include real property titled

14

in Dawn Prosser's name and recorded in St. Croix, bank accounts of which she is the sole holder,

bank and brokerage accounts "presently in her possession and the contents thereof," "all the

furniture, fixtures, *objects d'art* that are located within the real property described in Article 1

above [the Shoys Estate]," a 50% membership interest in ICC LLC, a 50% interest in all of the

common capital stock of the Virgin Islands Community Bank, retirement and/or deferred savings

plans and employment benefits that were in her name as of the date of the agreement, life

insurance policies in her name and her tangible personal effects such as clothing and jewelry.

Trial Ex. TE-90 (Marital Property Agreement, Dated January 18, 2006).  The credible evidence

clearly established that Mr. Prosser executed the Marital Property Agreement a mere nine days

after the entry of the Greenlight Judgment, and just two weeks prior to the filing of the

involuntary petition against him.  Mr. Prosser's disavowal of its existence, until the Chapter 11

Trustee found the document two years after the bankruptcy case commenced, constitutes a

concealment of documents material to the prosecution of the bankruptcy case.

**3.      Mr. Prosser ordered the destruction of computer hard drives located at the Palm
          Beach Property in an effort to conceal information, records, and documents from
          the Trustees**

Arthur Stelzer was a New ICC employee with duties to act exclusively as Mr. Prosser's

personal assistant and driver.  Trial Ex. TD-109 (Trial Test. of Arthur Stelzer, 198:12-14).  Mr.

Stelzer's employment began in September of 2002.  *Id.* at 199:21-23.  Mr. Stelzer's duties as Mr.

Prosser's personal assistant included traveling with Mr. Prosser on almost all occasions, making

hotel, transportation, and restaurant arrangements, assisting with Mr. Prosser's wardrobe, caring

for his personal belongings, picking up his prescription medicines, and anything else that Mr.

Prosser asked of him.  *Id.* at 200:9-21.  In addition, Mr. Stelzer also performed tasks for Dawn

15

Prosser and the Prossers' children. *Id.* at 200:20-201:9.

In October of 2007, while Mr. Prosser was in bankruptcy, Mr. Prosser directed Mr. Stelzer to erase the hard drives in both the laptop and the desktop computers located in Mr. Prosser's Palm Beach residence. Trial Ex. TD-109 (Trial Test. of Arthur Stelzer, 238:15-239:7, 248:12-15). Mr. Stelzer contacted Eric Bergstedt of Audio Advisors to perform the work. Trial Ex. TD-112 (Deposition of Eric Bergstedt, at 12:4-8).

Audio Advisors removed the hard drive from the desktop computer ("Drive 2"), gave it to Mr. Stelzer, and installed a new hard drive in the desktop computer ("Drive 1"). Trial Ex. TD-109 (Trial Test. of Arthur Stelzer, 276:5-11). Intelysis Corporation, which was appointed on August 11, 2008, as a court expert to compare the contents of Drives 1 and 2, concluded in its report that Drive 1 was installed in the desktop computer on October 10, 2007.[24] Mr. Stelzer gave the original hard drive from the desktop computer (Drive 2, which Audio Advisors removed) to James Lee, attorney for the Chapter 11 Trustee, when Mr. Lee interviewed Mr. Stelzer as a witness on December 19, 2007. *Id.* at 276:10-13. Mr. Lee later gave the hard drive (Drive 2) to the Chapter 7 Trustee after the Chapter 7 Trustee asserted that the hard drive was property of the Debtor and belonged to the Debtor's bankruptcy estate. Trial Ex. TD-111 (Trial Tr. 76:19-23; 80:4-8).

On October 17, 2007, then-counsel for the Chapter 7 Trustee, Cliff Taylor, took inventory of the Palm Beach residence. Mark Eckard, an attorney with Hamm and Barry, represented Dawn Prosser at the time, and was present at the Palm Beach residence for the

---

[24] Audio Advisors did not remove or replace the hard drive in the laptop computer, telling Mr. Stelzer that replacing the hard drive in the laptop required sending the laptop to Sony. *Id.* at 277:16-278:15.

16

inventory.  Trial Ex. TD-111 (Trial Test. of Mark Eckard, 10:1-7; 15:1-2; 50:13-19).  During the

inventory, Mr. Taylor wanted to take possession of the desktop computer, but was refused by

Mr. Eckard.  *Id.* at 14:4-6.  Eckard and Taylor then agreed that Mr. Eckard would have a copy

made of the hard drive (Drive 1, which was installed by Audio Advisors on October 10, 2007) on

the desktop computer.  *Id.* at 29:11-18.  Mr. Eckard instructed his client, Dawn Prosser, to make

a copy of the hard drive.  *Id.* at 52:11-53:5.

On October 23, 2007, Donovan Hamm, another attorney with the Hamm and Barry law

firm which represented Dawn Prosser, received from Dawn Prosser a copy of Drive 1, which he

turned over to Mark Eckard in St. Croix.  Trial Ex. TD-116 (Trial Test. of Donovan Hamm,

65:18-69:16).  That hard drive sat in Mr. Eckard's desk drawer in his office in St. Croix until Mr.

Eckard mailed the hard drive to Karin Bentz, a subsequent attorney for Dawn Prosser.

As noted above, the Court entered an Order on August 11, 2008, authorizing the retention

of Intelysis Corporation, a firm specializing in forensic computer analysis, to compare the

contents of Drive 1 (the hard drive installed in the Prossers' desktop computer on October 10,

2007, a copy of which was made and in the possession of Karin Bentz via Mr. Hamm and Mr.

Eckard) and Drive 2 (the hard drive removed from the desktop computer by Audio Advisors

when Drive 1 was installed, and which was in the possession of the Chapter 7 Trustee via Mr.

Stelzer and Mr. Lee).  Trial Exs. TD-119 (Trial Test. of Bruce Matolich, 9:21-25, 10:1-13); TE-

87 (Intelysis Report), at 1. Bruce Matolich of Intelysis served as a qualified expert for the

forensic analysis of the hard drives pursuant to the Court's order of August 11, 2008.  Trial exs.

TD-119, at 13:13-15, 12:25-14:22; TE-100 (Order Appointing Intelysis).  Mr. Matolich, together

with his superior at Intelysis (Jeff Brenner), created a report on the forensic analysis of Drives 1

17

and 2 entitled "Computer Forensic Analyst Report: Drives 1 and 2" dated August 18, 2008 (the "Report").  Trial Exs. TD-119, at 16:12-18; TE-87.

The Report concluded that Drives 1 and 2 were not copies of each other.  Trial Exs. TD-119, at 25:16-18, 100:23-101:1; TE-87.  The only similarities between the two drives were the operating system (Windows XP) and various other basic Microsoft software programs, such as Outlook Express, Windows Media Viewer, and Internet Explorer.  Trial Exs. TD-119, at 34:5-20; TE-87.  No user-generated files on Drive 1 appear on Drive 2, and no user-generated files on Drive 2 appear on Drive 1.  Trial Exs. TD-119, at 33:25-34:4; TE-87.  Drive 1 was installed on October 10, 2007, and its last shutdown date was October 19, 2007.  Trial Exs. TD-119, at 28:8-12; TE-87.  Drive 2 was installed on August 27, 2002, and its last shutdown date was October 3, 2007.  Trial Exs. TD-119, at 28:22-23, 29:14-16; TE-87, at 3.  Files on Drive 2 were accessed on October 5, 2007, and October 6, 2007, after Drive 2's last shutdown date.  Trial Exs. TD-119, at 29:21-24; TE-87.

Based on the foregoing, Mr. Matolich determined that, contrary to Mr. Prosser's assertions and consistent with Mr. Stelzer's testimony that Mr. Prosser had ordered the destruction of a hard drive, it was impossible for Drive 1 to be a copy of Drive 2.  Trial Ex. TD-119, at 46:11-14.  The install and shutdown dates on the two hard drives lend further support to Mr. Stelzer's testimony regarding the attempted destruction of the information on Drive 2.[25]

---

[25] In addition, Eric Bergstedt of Audio Advisors, who initially testified in July of 2008 that Mr. Stelzer contacted him on October 18, 2007, to remove Drive 2 from the desktop computer and to have Drive 1 installed, later changed his testimony to state that the installation of Drive 1 had to have occurred on October 10, 2007, based on the Intelysis Report.  Prosser Trial Ex. 19 (Deposition of Eric Bergstedt, April 16, 2010, 50:23-25).  Mr. Bergstedt's revised version of events is now consistent with the Intelysis Report showing that Drive 1 was installed

(continued...)

18

Intelysis created compact disc ("CD") copies of Drives 1 and 2 and made them available to counsel for Mr. and Mrs. Prosser for privilege review. Trial Ex. TD-121 (Trial Test. of Bruce Matolich, 38:9-19). Counsel for Mr. Prosser transmitted a log of privileged files from Drive 1 and Drive 2 to Mr. Matolich. *Id.* at 38:17-19; TE-103 (Jeffrey Prosser's Privilege Log for Hard Drive 2). Mr. Matolich then redacted the privileged files and distributed to counsel two CDs that excluded the redacted privileged files. Trial Exs. TD-121, at 38:20-23; TE-103. The first CD accompanied the "Computer Forensic Analyst Report: Drives 1 and 2" and was produced to the parties on August 22, 2008 (the "August 22 CD"). Trial Exs. TD-121, at 38:4-16, 44:5-8; TE-87. The second CD accompanied a supplemental Intelysis forensic analysis report dated September 19, 2008, and was produced to the parties on September 25, 2008 (the "September 25 CD"). Trial Exs. TD-121, at 38:4-16, 44:5-8. Mr. Matolich reviewed a portion of the August 22 CD, which contained user-generated files from Drive 2. Trial Exs. TD-121, at 49:20-56:9; TE-104 (the August 22 CD).

Mr. Matolich identified several documents in which Mr. Prosser, individually or on behalf of New ICC or the ICC Debtors, was the signatory or recipient. The documents included correspondence that contained financial and business information. Trial Exs. TD-121, at 49:20-56:9; TE-104.

The Court finds that, as established by credible evidence, Mr. Prosser ordered the destruction of hard drives, which contained pertinent financial and business information related to this bankruptcy, on computers located in his Palm Beach residence and utilized by Mr.

---

[25](...continued)
on October 10, 2007. Mr. Stelzer never testified to the exact dates of any of these events, only that they occurred in October 2007.

Prosser.

**4.      Mr. Prosser failed to disclose and/or materially undervalued assets in his schedules**

As noted at the outset of this Opinion, the Debtor filed his Original Schedules on

September 25, 2006. He subsequently amended those schedules, as relevant here, four times after

being confronted with evidence that he had undervalued or failed to disclose assets and

liabilities.

On December 11, 2007, this Court entered an order directing, *inter alia*, Mr. Prosser and

Dawn Prosser to provide the Trustees with a complete and detailed inventory of all property as to

which they had knowledge, possession, custody, or control.[26]  Pursuant to that Order, the Debtor

filed amended schedules on January 11, 2008 (the Fourth Amendment), listing assets alleged to

be individually owned by Jeffrey Prosser, those owned individually by Dawn Prosser,  and those

assets jointly owned by the two.  Trial Exs. TE-12 (Order Granting Application for Preliminary

Injunction); TD-108 (Trial Test. of James P. Carroll, 20:15-17); TE-2-6.

Throughout the course of this bankruptcy proceeding, Mr. Prosser has repeatedly

misrepresented the existence and value of his assets by filing incomplete and inaccurate

schedules.  Corrective revisions to these schedules came only after Mr. Prosser was confronted

with evidence establishing that the schedules were not an accurate reflection of his assets and/or

liabilities.  The following subcategories (a-f) are assets and liabilities that Mr. Prosser has never

included in his schedules or included only after being confronted with evidence that the facts

differed from information in his schedules.

---

[26] *Order Granting Application for Preliminary Injunction*, Adv. Pro. No. 07-3010, Doc.
No. 79, at 6.

20

a. **Mr. Prosser failed to disclose hundreds of bottles of wine with an aggregate value in the millions of dollars until after they were discovered by the Chapter 7 Trustee and, upon disclosure, Mr. Prosser significantly understated the value of the wine**

Although Mr. Prosser would later admit to the Court that the value of his wine collection was worth "a couple of million dollars,"[27] he failed to list his wine collection in the schedules until the Third Amendment.  Trial Ex. TE-2-5.  The Third Amendment indicates a one-half interest in "various wines" at his three residences (Lake Placid, Palm Beach, and Estate Shoys) that, in combination with extensive audio and video equipment located at his three properties and Alexander Popovic frescos located at the Palm Beach residence, were identified as having a cumulative value of $500,000.  TE-5 (Third Amendment).

Mr. Prosser never provided an individual value or specific identifications for the wines listed in his schedules.  Instead, he ultimately set forth the values of the wines in his updated inventory of jointly owned assets, which was provided to the Trustees.  In his updated inventory, Mr. Prosser listed the value of the wines located in Palm Beach at $200,000; the wines located at the Shoys Estate at $25,000; and the wines located in Lake Placid at $10,000, for a total of $235,000 for all the wines.  Trial Exs. TE-55 (Updated Inventory of Assets Jointly Owned); TD-108 (Trial Test. of James P. Carroll, 100:24-101:7).  Mr. Prosser also undervalued his wine collection at the § 341 meeting of creditors, where he stated the value as approximately $140,000.  Trial Ex. TD-156 (Section 341 Test. of Jeffrey J. Prosser, Nov. 14, 2007, 26:1-23).

However, upon investigation the Chapter 7 Trustee discovered that there were also hundreds of bottles of wine stored for Mr. Prosser at Park Avenue Liquors in New York City. Trial Ex. TD-108, at 159:20-25, 160:1-10.  The Chapter 7 Trustee also discovered an additional

---

[27] Trial Ex. TD-115 (Trial Test. of Jeffrey J. Prosser, 132:1-136:11).

21

thirty to forty cases of wine stored at Zachys Wine & Liquor in Scarsdale, New York. *Id.* at
160:11-14. The Chapter 7 Trustee retained Christie's, Inc. to value Mr. Prosser's wines. *Id.* at
103:12-24. Christie's Inc. provided a value range that was significantly higher than the
$235,000 Mr. Prosser listed as the value for his wines on his updated inventory of jointly owned
assets. *Id.* at 104:9-105:9.

Portions of the estate's half of the wine collection were sold on March 28, 2009, April
26, 2009, and June 6, 2009, at Christie's New York, 20 Rockefeller Plaza, New York, NY
10020, for a total of $591,150.[28] Trial Exs. TD-140; TD-142. These sales, alone, establish that
Mr. Prosser materially undervalued his interest in his wine collection. Nevertheless, there is
more.

The other half of the wines were initially allocated to Dawn Prosser pursuant to a Court-
approved stipulation entered into between Mrs. Prosser and the Chapter 7 Trustee (the "9019
Order").[29] The 9019 Order left in place a preliminary injunction the Court previously imposed
on the Debtor and Dawn Prosser (the "Injunction"), which enjoined them from spending,
consuming, damaging, disposing of, sequestering, absconding with, secreting, or transferring any
wine in any form whatsoever without prior Court approval.[30] The Injunction also required the
Prossers to keep the wines in secure locations and to protect them from theft, destruction,

---

[28] After expenses, the resulting net proceeds to the estate totaled $582,435. Trial Ex. TD-142.

[29] *See Order Approving Stipulation and Agreed Order Between Chapter 7 Trustee and Dawn Prosser: (A) Settling and Resolving Adversary Proceeding, Without Prejudice to Certain Claims; and (B) Providing for the Division and Sale of a Portion of Certain Fine Wines, Champagne, Liquors, and Other Spirits*, Adv. Pro. No. 08-3010, Doc. No. 61.

[30] *Order Granting Application for Preliminary Injunction*, Adv. Pro. No. 07-3010, Doc. No. 79.

22

modification, or any other form of removal or damage.[31] After the conclusion of trial, this Court

entered an Opinion in the Turnover Action (the "Turnover Order"), which determined, *inter alia*,

that the wines allocated to Dawn Prosser under the 9019 Order are property of the Chapter 7

Estate, and required Dawn Prosser to turn all of it over to the Chapter 7 Trustee.  The Turnover

Order made the Injunction permanent until Dawn Prosser turned the wines over to the Chapter 7

Trustee.  On September 18, 2012, after another trial (the "Contempt Trial"), the Court found the

Debtor and Dawn Prosser in civil contempt of court for failure to comply with the terms of the

Injunction.[32]  The Court found that the Prossers caused or permitted hundreds of bottles of wine

subject to the Injunction and Turnover Order to disappear from the Prossers' Palm Beach

residence and from the Shoys Estate, and allowed hundreds of additional bottles of wine at the

Shoys Estate to be irreparably damaged.[33]

     The Court finds that the Debtor materially misrepresented his assets by failing to disclose

his substantial wine collection, and, upon its eventual disclosure, significantly undervaluing the

wines.

**b.**      **Mr. Prosser failed to disclose a cigar collection with an aggregate value in the
thousands of dollars**

     Mr. Prosser also neglected to disclose his interest in a large cigar collection.  Trial Exs.

TE-2-6; TD-109 (Trial Test. of James P. Carroll, 65:9-11).  The Chapter 7 Trustee found

hundreds of cigars during his walkthrough of the Palm Beach residence in January of 2008.  TD-

---

[31] *Id.*

[32] *See Memorandum Opinion*, Adv. Pro. No. 07-3010, Doc. No. 1005.

[33] *Id.*  As the evidence from the Contempt Trial established, these estate assets, which Mr.
Prosser failed to preserve, were worth in excess of $500,000.

109, at 64:2-11.  Trustee Carroll also observed cigars at the Shoys Estate, though there were not

as many as were present in Palm Beach.  *Id.* at 64:22-25, 65:1.  Both the Chapter 7 Trustee and

Mr. Prosser's former valet, Arthur Stelzer, testified that Mr. Prosser smoked cigars.  *Id.* at 65:2-8

(Trial Test. of James P. Carroll); *id.* at 241:9-17 (Trial Test. of Arthur Stelzer).  The Chapter 7

Trustee estimated the total value of the cigar collection to be in the thousands of dollars.  *Id.* at

68:22-25, 69:1-4 (Trial Test. of James P. Carroll).

**c.**     **Mr. Prosser failed to disclose valuable watches, jewelry, and a Bernard Passman
chalice, and materially undervalued the jewelry and watches.**

Mr. Prosser failed to identify the following pieces of jewelry until after they were

discovered by the Chapter 7 Trustee: (i) two Patek Phillipe watches; (ii) a Chopard rose gold

Tourbillon watch; (iii) a Chopard white gold watch with a blue band; (iv) a gold ring with round

diamonds; and (v) a gold ID bracelet.  Trial Exs. TD-109 (Trial Test. of Arthur Stelzer, 226:14-

22); TE-6.

On Schedule B of both his Original Schedules and on the First Amendment, Mr. Prosser

listed "Various Jewelry" with a current market value "Estimated at $20,000."  Trial Exs. TE-2-3.

No specific items of jewelry were listed.  *Id.*

Upon the Chapter 7 Trustee's discovery of specific pieces of jewelry, Mr. Prosser, as part

of the Third Amendment, amended his schedules to replace his generic entry of "Various

Jewelry" with the following items under the category of furs and jewelry: "Chopard watch rose,

white gold Chopard watch with blue band, Chopard ring, TAG watch, various cuff links, two

Cruzian bracelets, and Paterick [sic] Phillipe watch."  Trial Ex. TE-5.  Mr. Prosser kept the

collective value of these pieces of jewelry listed at $20,000, the same amount reflected on his

Original Schedules.  The Court-ordered inventory prepared by Mr. Prosser also reflects a

24

collective value of his personal jewelry of $20,000.  Trial Ex. TE-53.

Despite his amended schedules, Mr. Prosser testified that the Chopard rose gold watch was purchased for $78,984, excluding taxes, on or about April 13, 2004.  Trial Ex. TD-110 (Trial Test. of Jeffrey J. Prosser, 248:8-16).  With taxes included, the watch cost $83,723.  *Id.*  Thus, for this watch alone, Mr. Prosser paid more than four times the total value that he listed on Schedule B for all of his jewelry combined.  Mr. Prosser testified that he paid approximately $12,000 for the Chopard white gold watch.  *Id.* at 249:2-15.  One of the Patek Phillipe watches discovered by the Chapter 7 Trustee cost $54,160.  Trial Ex. TE-64.  The Chapter 7 Trustee also found that Mr. Prosser undervalued the jewelry that was disclosed based on an appraisal the Chapter 7 Trustee had obtained.  Trial Ex. TD-108 (Trial Test. of James P. Carroll, 106:8-15).  The independent appraiser retained by the Chapter 7 Trustee valued the watches and jewelry eventually disclosed by Mr. Prosser at between $150,000 and $180,000.  *Id. at* 106:8-108:24.

After the bankruptcy was filed, Mr. Prosser gave jewelry to Mr. Stelzer, his personal assistant, so that Mr. Stelzer could go out and get a lowball price for certain pieces of jewelry.  Trial Ex. TD-109 (Trial Test. of Arthur Stelzer, 220:6-10, 223:3-8).  Mr. Stelzer had personal knowledge of the watches owned by the Debtor, and testified that he was sometimes involved with acquiring watches for Mr. Prosser.  *Id.* at 204:17-25, 205:1.  Mr. Stelzer knew that all of the jewelry given to him by Mr. Prosser for purposes of obtaining an estimate of their value belonged to Mr. Prosser.  *Id.* at 224:12-15.  One of the pieces of jewelry given to Mr. Stelzer was the aforementioned Chopard rose gold watch.  *Id.* at 220:3-10.  In addition, Mr. Stelzer was given the following undisclosed pieces of jewelry: a Breguet solid gold watch; a solid gold Parmagani watch; an all gold ID bracelet; cufflinks; a $20 gold piece money clip; a Tag Heuer

stainless steel watch; a Passman black coral, 18 karat yellow gold ring; and a 2 carat diamond

ring.  *Id.* at 220:13-221:18.

Eling Joseph, Mr. Prosser's executive secretary for eighteen years, testified that Mr.

Prosser owned two rings matching the descriptions given by Mr. Stelzer.  Trial Ex. TD-111

(Trial Test. of Eling Joseph, 99:3-10, 92:1-5).  Mr. Prosser's ownership of the Parmagani and

Breguet watches is corroborated by invoices from Tourneau for services rendered related to

those watches.  Trial Ex. TE-85.

Both Eling Joseph and Arthur Stelzer testified that Mr. Prosser owned a Rolex watch and

that he wore it after his petition date, July 31, 2006.  Trial Exs. TD-109 (Trial Test. of Arthur

Stelzer, 235:9-236:1); TD-111 (Trial Test. of Eling Joseph, 92:25-93:7, 95:1-14, 96:3-7).  Mr.

Stelzer testified that it was in fact a "Presidential" Rolex watch.  Trial Ex. TD-109 (Trial Test. of

Arthur Stelzer, 235:9-236:1).  Dawn Prosser also testified that Mr. Prosser owned a Rolex watch.

Trial Ex. TD-113 (Deposition of Dawn Prosser, July 21, 2008, 216:10-11).  Mr. Prosser did not

list a Rolex watch on any iterations of his schedules.  Trial Exs. TE-2-6.  Further, he testified that

he could not recall ever owning a Rolex watch.  Trial Ex. TD-114 (Deposition of Jeffrey Prosser,

July 22, 2008, 317:9-13).

Mr. Stelzer was involved with purchasing a Franck Muller watch for Mr. Prosser.  Trial

Ex. TD-109 (Trial Test. of Arthur Stelzer, 246:16-22).  Mr. Prosser wore this watch and Mr.

Stelzer last saw it in July of 2007 (a year after the voluntary petition date), at the Lake Placid

residence.  *Id.* at 236:18-24.  The Franck Muller watch was never listed on Mr. Prosser's

schedules.  Trial Exs. TE-2-6.

Finally, in October 2007, Dawn Prosser gave Mr. Stelzer a chalice designed by Bernard

Passman and asked Mr. Stelzer to remove it from the house.  Trial Ex. TD-109 (Trial Test. of

Arthur Stelzer, 227:10-230:4, 289:4-290:21).  Mr. Prosser did not disclose the existence of this

chalice until the Third Amendment, in which he listed the value of the chalice at $200,000.  Trial

Ex. TE-5.  The chalice was eventually sold at auction by Christie's New York on behalf of the

Chapter 7 Trustee for $55,000, resulting in a net to the estate of $44,980.[34]

The Court finds that Mr. Prosser concealed the existence of expensive jewelry and a

valuable chalice either by failing to list the items on his schedules or by listing the items only

when confronted by the Chapter 7 Trustee with the fact that he had discovered undisclosed

assets.  Furthermore, upon disclosure, Mr. Prosser materially undervalued his jewelry and

watches.

**d.      Mr. Prosser failed to disclose his interest as an officer in AMJ, Inc.**

In his sworn deposition on July 22, 2008, Mr. Prosser testified that he was never the

President of AMJ, Inc. Trial Ex. TD-114 (Deposition of Jeffrey Prosser, July 22, 2008, 349:22-

350:6).  However, on May 16, 2003, the Debtor signed a letter, as President of AMJ, Inc.,

authorizing a payment of $150,000 from NTB Bank to Jeffrey J. Prosser through a credit to his

individual Bank of America account.  Trial Exs. TD-115 (Trial Test. of Jeffrey J. Prosser,

106:23, 115:5-10); TT-131 (AMJ, Inc. Documents).

Mr. Prosser failed to list his affiliation with AMJ, Inc. on his Statement of Financial

Affairs, which requires a debtor to list all the names, addresses, tax identification numbers, and

nature of business of any company in which the debtor was an officer, director, and/or partner in

---

[34] *Chapter 7 Trustee's Report of Sale Regarding Certain of Debtor's Personal Property
Assets Pursuant to 11 U.S.C. § 363 and Court Approved Sale Procedures*, Case No. 06-30009,
Doc. No. 1832.

the six years immediately preceding the commencement of this case. Trial Exs. TD-115 (Trial

Test. of Jeffrey J. Prosser, 217:10-219:11); TE-1 (Statement of Financial Affairs). As evidenced

by the May 16, 2003, letter, Mr. Prosser's status as an officer of AMJ, Inc. existed within six

years of his petition date of July 31, 2006. No credible explanation for the omission has been

proffered.

**e.      Mr. Prosser materially undervalued his Lake Placid residence and his Virgin
          Islands Community Bank stock**

On every iteration of Mr. Prosser's schedules, the value of his Lake Placid residence was

listed at $1,391,000. Trial Exs. TD-2-6. This figure was $2 million less than the market value as

ascertained by the Chapter 7 Trustee. Trial Ex. TD-108 (Trial Test. of James P. Carroll, 97:25-

98:3, 98:16-20). The broker in Lake Placid retained by the Chapter 7 Trustee to list the Lake

Placid residence, after reviewing comparable listings in the area, listed the Lake Placid residence

at $3.5 million. *Id.* at 98:7-13. A sale was negotiated for $3.55 million but failed to close when

the purchaser reneged.[35] The Lake Placid residence was ultimately sold for $2.7 million. Trial

Ex. TD-139.

Mr. Prosser also materially undervalued his interest in the VICB stock at $4.7 million,

the amount of his capital investment. Trial Exs. TE-5-6; TD-108 (Trial Test. of James P. Carroll,

189:13-17). However, at the time Mr. Prosser listed the value of his stock, the true value was

approximately $6.5 million. Trial Ex. TD-108 (Trial Test. of James P. Carroll, 189:22-25,

190:1-5). Subsequent to the filing of his schedules and while Mr. Prosser was in control of the

---

[35] Damages due to the failure to close, in the amount of $640,689.40, were awarded by
this Court by Order dated February 8, 2011, in Adv. No. 09-3001, now on appeal to the District
Court at Civil Case No. 3:11-cv-00022-CVG-RM.

VICB, a defalcation occurred within the bank. *Id.* at 189:22-190:5.  The FDIC entered a cease

and desist order against the VICB.  *Id.*  Ultimately, the Chapter 7 Trustee received $2.8 million

in cash from the sale of the stock and approximately $3.6 million in interest-bearing promissory

notes from Vitelco and two other operating entities to repay the defalcation. *Id.* at 190:18-

194:24.  Therefore, the ultimate value to be received by the estate is $6.4 million.  The Court

finds Mr. Prosser's valuation to be unreasonably deficient.

The material undervaluation of the Lake Placid residence and Mr. Prosser's interest in the

VICB stock was established by credible evidence, and was inconsistent with Mr. Prosser's duties

as a debtor.

**f.      Mr. Prosser failed to disclose the existence of storage units in West Palm Beach, Florida, containing records and personal property relevant to the bankruptcy.**

New ICC rented two storage units in West Palm Beach, Florida, from Extra Space

Storage, previously known as Storage USA.  Trial Ex. TE-75.  The storage units were rented to

store "household" property, and according to Extra Space Storage's documentation, Mr. Prosser

was authorized to access the unit.  Trial Exs. TD-115 (Trial Test. of Jeffrey J. Prosser, 72:17-

73:8); TE-75.  Mr. Prosser originally directed New ICC to lease the storage unit, for purposes of

storing household goods and a Porsche, registered in Dawn Prosser's name but driven by Mr.

Prosser.  The Porsche was stored in the storage unit.  Trial Exs. TD-118 (Trial Test. of Stan

Springel, 71:19-25, 72:1-12); TE-75.  Oakland Benta, an employee of New ICC who handled

security for the Prossers, testified that the storage unit was acquired in 2001 "to house one of the

vehicles of Mr. Prosser."  Trial Ex. TD-118 (Trial Test. of Oakland Benta, 104:23-105:8,

108:12-24).

In May 2008, nearly two years into the Debtor's voluntary bankruptcy case, the storage

29

units were discovered and identified by the Chapter 7 Trustee after receiving responses to a

subpoena.  Trial Ex. TD-108 (Trial Test. of James P. Carroll, 92:21-93:5).  When the Chapter 7

Trustee's representatives arrived at the storage units, they discovered at least eleven boxes of

undisclosed documents that were responsive to previously propounded discovery requests and

that should have been turned over to the Trustees.   Trial Exs. TD-108 (Trial Test. of James P.

Carroll, 87:18-91:17); TD-117 (Trial Test. of James P. Carroll, 141:16-21).  The Prossers also

stored personal property in the storage units, such as seasonal decorations, glassware, and

dishware.  Trial Ex. TD-108 (Trial Test. of James P. Carroll, 89:8-15).

The boxes of documents found in the storage units contained, *inter alia*, cancelled checks

in Mr. Prosser's name.  Trial Ex. TD-108 (Trial Test. of James P. Carroll, 94:17-22).  The

Marital Property Agreement was also discovered in one of the boxes.  Trial Ex. TD-117 (Trial

Test. of James P. Carroll, 106:11-22).

Mr. Prosser contends he had no knowledge of the storage units despite the fact that rent

payments were made first by New ICC and later, by his son, Adrian Prosser. Trial Exs. TD-115

(Trial Test. of Jeffrey J. Prosser, 56:14-57:9, 71:20-25); TE-47 (Regent Bank Account

Statements, Account No. 6100130906); TE-75 (Extra Space Storage Documents).  The money

for the rent came out of the bank account held in Adrian Prosser's and Linda Hirsch's name in

December 2007 and January 2008.  The rent checks were signed by Adrian Prosser.  Trial Exs.

TD-118 (Trial Test. of Stan Springel, 84:24-87:7); TE 75 (Extra Storage Space Documents).  In

addition, Mr. Prosser, Innovative Communication Corporation, and New ICC employees Cordell

Johnson and Anthony Elskoe were each listed as contacts for Extra Space Storage.  Trial Exs.

TD-118 (Trial Test. of Stan Springel, 70:24-25, 71:1-18); TE 75 (Extra Storage Space

30

Documents).  Furthermore, the keys to the storage units were kept in the Prossers' home and

were keyed to the lock of the Prossers' Palm Beach residence.  Trial Ex. TD-121 (Trial Test. of

Cordell Johnson, 102:24-106:2).

The credible evidence established and the Court finds that Mr. Prosser knowingly failed

to disclose the existence of two large storage units and their contents in West Palm Beach,

Florida.  The units contained at least eleven large boxes of undisclosed documents that were

under the control of Mr. Prosser.  These documents were responsive to previously propounded

discovery requests and should have been turned over to the Trustees.

### 5.    Mr. Prosser failed to obey this Court's Orders

While Mr. Prosser's bankruptcy case was still in chapter 11, the RTFC moved to convert

Mr. Prosser's bankruptcy case to chapter 7, which this Court denied in favor of appointing an

examiner.[36]  We ordered Mr. Prosser to cooperate with the examiner.  On April 5, 2007, the

United States Trustee recommended and the Court appointed former U.S. Bankruptcy Judge

Steven A. Felsenthal (the "Examiner").[37]

Despite the Court's order to cooperate, the Court was subsequently notified by the

Examiner that Mr. Prosser had failed to make his records and personnel available.[38]  The Court

allowed Mr. Prosser two weeks from the May 16, 2007, hearing date in which to make his

records and personnel available to the Examiner but, on June 20, 2007, three weeks beyond the

Court-imposed deadline, the Debtor had yet to provide such access.  The Examiner filed a

---

[36] *Order of Court Denying Motion to Convert and Extending Time to File Objections to Exemptions and Ordering Appointment of an Examiner*, Case No. 06-30009, Doc. No. 372.

[37] *Order Approving Appointment of Examiner*, Case No. 06-30009, Doc. No. 465

[38] May 16, 2007, Tr., Doc. No. 593, at 44-50.

31

motion to compel, which this Court granted on August 3, 2007, requiring, among other things,

Mr. Prosser to provide "immediate and unfettered" access to all documents, information, and

personnel requested by the Examiner (the "Cooperation Order").[39]  The Cooperation Order

provided that a failure to comply could, among other things, result in a conversion of his case to

chapter 7.[40]

On September 19, 2007, Byron Smyl, a managing partner at Alvarez & Marsal[41], filed an

affidavit of non-compliance on behalf of the Chapter 11 Trustee, reporting that Mr. Prosser had

failed to comply with the Cooperation Order.[42]  Thus, on October 3, 2007, Mr. Prosser's chapter

11 bankruptcy case was converted to a case under chapter 7.[43]  The Conversion Order stated: "as

of the hearing on September 21, 2007, Debtor still had not released to the Examiner his personal

checking account statement and had not requested, or only recently requested, records from his

bank and, although information was sought by the Trustee for a period of 10 years, no effort was

made by Debtor to provide recent information."[44]

James P. Carroll was appointed as the Chapter 7 Trustee on October 31, 2007.  Trial Ex.

---

[39] *Order Granting the Examiner's Motion to Compel Debtor to Provide Examiner Access to Certain Personnel and Records*, Case No. 06-30009, Doc. No. 729.

[40] *Id.*

[41] Alvarez & Marsal was retained by the Chapter 11 Trustee to assist in the corporate Chapter 11 proceedings.  Trial Ex. TD-109 (Trial Test. of Byron Smyl, 117:18-25).

[42] *Affidavit of Default Submitted By Byron Smyl In Accordance with This Court's Order Granting the Examiner's Motion to Compel Debtor to Provide Examiner Access to Certain Personnel and Records*, Case No. 06-30009, Doc. No. 832.

[43] *Order Converting Case to Chapter 7*, Case No. 06-30009, Doc. No. 865 (the "Conversion Order").

[44] *Id.* at 5.

32

TD-108 (Trial Test. of James P. Carroll, 12:6-8).  In pursuing his duties as Chapter 7 Trustee

under 11 U.S.C. § 704, Mr. Carroll was in communication with the Chapter 11 Trustee and

reviewed the reports of the Examiner. *Id.* at 13:8-10.  The Chapter 7 Trustee also made the effort

to investigate the financial affairs of the Debtor on his own.  The Chapter 7 Trustee confirmed

that the Examiner never obtained the bank statements he had requested from Mr. Prosser.  *Id.* at

13:15-19.  The Chapter 7 Trustee testified that, much like what occurred during the Examiner's

tenure, Mr. Prosser's cooperation during the Chapter 7 Trustee's administration of the case was

poor.  *Id.* at 95:18-23.  Mr. Prosser denied the Chapter 7 Trustee access to records located in Mr.

Prosser's homes.  Trial Ex. TD-109 (Trial Test. of James P. Carroll, 33:16-25, 34:1-4).  The

Chapter 7 Trustee directed requests for documents to Mr. Prosser that went unanswered.  *Id.* at

46:10-12.  Mr. Prosser failed to provide or disclose all the bank statements and credit card

statements requested by the Chapter 7 Trustee.  *Id.* at 100:1-19.  The Chapter 7 Trustee was

forced to acquire Mr. Prosser's bank statements from the Chapter 11 Trustee after being unable

to get them from Mr. Prosser.  *Id.* at 137:5-14.  In all the time between the date of filing, July 31,

2006, and Mr. Prosser's § 341 meeting on November 14, 2007, Mr. Prosser did not deliver a

single bank statement to the Chapter 7 Trustee.  *Id.* at 137:23-138:13.[45]

---

[45] Further evidence of Mr. Prosser's lack of cooperation was established with respect to
the Chapter 11 Trustee, Stan Springel.  In the spring of 2007, when New ICC was still controlled
by Mr. Prosser, Mr. Smyl requested financial documents related to New ICC and ICC-LLC.
Trial Ex. TD-109 (Trial Test. of Byron Smyl, 125:3-8).  Mr. Smyl understood through
conversations with Bobby Lubana, Vice President of Finance for New ICC, and Dennis Kanai,
Chief Financial Officer of New ICC, that decisions regarding what documents were to be
provided to Mr. Smyl were made by Mr. Prosser and conveyed through Mr. Lubana.  *Id.* at
125:9-126:17.  The Cooperation Order was issued after the failure to produce these documents.
Trial Ex. TE-11.  As noted above, notwithstanding the entry of the Cooperation Order, Mr.
Prosser continued to deny immediate, full, complete, and unfettered access to New ICC's books

(continued...)

## CONCLUSIONS OF LAW[46]

The Chapter 7 Trustee objects to the Debtor's discharge under § 727(a)(2), (3), (4), and

(6), the merits of which will be discussed below.  A discharge in bankruptcy is a privilege, and

not an absolute right.  *Cadle Co. v. Ogalin (In re Ogalin)*, 303 B.R. 552, 557 (Bankr. D. Conn.

2004) ("[T]he relief of a bankruptcy discharge is not an absolute right, but rather, a privilege

accorded to honest debtors who conduct their financial affairs with honesty and openness, and

otherwise satisfy the Bankruptcy Code's statutory obligations.").  The elements to deny

discharge must be proven by a preponderance of the evidence.  *Bohm v. Dolata (In re Dolata)*,

306 B.R. 97, 146 (Bankr. W.D. Pa. 2004).   The burden of proving the statutory grounds for

denial of discharge under § 727(a) is on the objecting party.  *Sherwood Fine Art, Inc. v. Burrik*

*(In re Burrik)*, 459 B.R. 881 (Bankr. W.D. Pa. 2011) (citing 6 *Collier on Bankruptcy*, ¶ 727.01[2]

at 727-8 (Bender, 2010)); *See also* Fitzgerald, Gonzalez, & Walrath, *Rutter Group Practice*

*Guide: Bankruptcy* § 22:1525 (The Rutter Group 2012).

### *Unclean Hands Defense*

Before turning to the various counts under § 727(a), the Court must first address an

argument raised by the Debtor concerning his right to assert an "unclean hands" defense against

various Plaintiffs in the Discharge Adversary Proceedings.  As it relates to the Chapter 7 Trustee,

---

[45](...continued)
and records.  Trial Ex. TD-109 (Trial Test. of Byron Smyl, 137:13-16).  Mr. Prosser was
subsequently removed from control of New ICC and the requested records were easily obtained.
*Id.*  Thus, the Debtor's failure to abide by Court orders was clearly established.

[46] To avoid unnecessary duplication, the factual findings relied upon to support this
Court's Conclusions of Law, (already set forth in detail, including citations to the record, in the
Findings of Fact section, *supra*) shall only be briefly summarized in this section, where
applicable, and with citations to the record omitted.

the Debtor alleges that the Chapter 7 Trustee disbursed approximately $1 million dollars of

estate assets to the Greenlight Entities, without Court approval.  According to the Debtor, the

"unclean hands" defense is applicable and precludes the Chapter 7 Trustee from seeking denial

of Mr. Prosser's discharge.  While we acknowledge that a disbursement was made to the

Greenlight Entities, without Court approval, we must disagree that this disbursement precludes

the Chapter 7 Trustee from objecting to discharge under § 727.[47]

The "unclean hands" doctrine is based on the principle that a party who has committed

wrongdoing should not be allowed to come into court and request a remedy for its own personal

benefit.  *See In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir. 1999).  However, § 727(a)

actions, seeking denial of a debtor's discharge, are filed on behalf of *all* creditors of the debtor's

estate.  Section 727 actions do not seek a remedy for a party's individual benefit but, rather, such

actions serve the public purpose of vindicating the integrity of the bankruptcy process.  *See, e.g.*,

*State Bank of India v. Chalasani* (*In re Chalasani*), 92 F.3d 1300, 1311 (2d Cir. 1996); *In re

Glunk*, 342 B.R. 717, 733 (Bankr. E.D. Pa. 2006); *In re Mumin*, 1998 WL 160992, at *3 (Bankr.

E.D. Pa. Apr. 1, 1998); *Royal Bank of Pa. v. Grosse* (*In re Grosse*), 1997 WL 668059, at *3

(Bankr. E.D. Pa. Oct. 15, 1997).  Thus, the Chapter 7 Trustee represents all creditors in this §

727 action and has no personal stake in the outcome.[48]

---

[47] The Chapter 7 Trustee's disbursement to the Greenlight Entities has since been
approved *nunc pro tunc* by the Court by Order dated November 29, 2012, filed at 06-30009,
Doc. No. 4027.

[48] A chapter 7 trustee may recover his commission within the statutory amounts
prescribed in § 326(a) once he distributes proceeds.  The denial of discharge does not generate
distributable proceeds in a bankruptcy.  Rather, it serves to preserve debts so that individual
creditors can pursue a debtor after the bankruptcy ends.  Thus, a trustee has no personal interest,

(continued...)

35

Thus, unlike actions to exempt a particular debt from discharge under § 523,[49] the

unclean hands defense has no applicability in § 727 actions seeking the broader relief of denying

a general discharge.   The Sixth Circuit Court of Appeals held as much in the case of *Giant*

*Eagle Inc. v. Monus* (*In re Monus*), 167 Fed. Appx. 494, 496 (6th Cir. 2006).  In *Monus,* the

debtor, while president and chief operating officer of Phar-Mor, Inc., participated in a fraudulent

scheme whereby Phar-Mor's profits were falsely inflated.  *Monus*, 167 Fed. Appx. at 495.

During that time, Giant Eagle purchased approximately $50 million in Phar-Mor stock.  After the

debtor was convicted of fraud, both Monus and Phar-Mor filed for bankruptcy.  *Id.*  Under Phar-

Mor's reorganization plan, all of its stock was cancelled, and Giant Eagle received no

distribution.  *Id.*  Giant Eagle filed an adversary proceeding against Monus, and moved for

summary judgment, seeking to exempt its $50 million claim from discharge under § 523(a)(2)(B)

or (a)(6), or alternatively, seeking to deny a general discharge under § 727(a)(2), (a)(3), and

(a)(7).  *Id.*  Giant Eagle's motion for summary judgment was granted only as to § 727(a)(7), with

the bankruptcy court concluding that Mr. Monus' criminal conviction was sufficient proof of all

necessary elements under § 727(a)(7).  *Id.*

On appeal to the bankruptcy appellate panel, the panel affirmed the grant of summary

judgment in favor of Giant Eagle, and in doing so rejected Mr. Monus' argument that Giant

Eagle was precluded from seeking to deny discharge under the unclean hands defense, because

---

[48](...continued)
even to the extent of a statutory fee, in a § 727 action.

[49] *See Hopper v. Everett* (*In re Everett*), 364 B.R. 711, 724 (Bankr. D. Ariz. 2007)
(holding that the plaintiff's "unclean hands" resulted in his being barred from seeking to have the
alleged debt deemed nondischargeable under § 523).

36

according to Mr. Monus, Giant Eagle had participated in the fraudulent scheme.  *Id.* at 496.

Significantly, the panel held that, unlike in actions seeking to exempt a debt from a debtor's

discharge under § 523, the doctrine of unclean hands was inapplicable in § 727(a) actions.  *Id.*

The panel noted that "the inquiry in a proceeding under § 727(a) is directed toward protecting

the integrity of the bankruptcy system by denying discharge to debtors who engage in

objectionable conduct that is of a magnitude and effect broader and more pervasive than fraud on

a single creditor."  *Id.*  The Court of Appeals for the Sixth Circuit affirmed the bankruptcy

appellate panel's decision.  *Id.*

      Mr. Prosser attempts to distinguish *Monus* by arguing that the reason why the unclean

hands doctrine was held to be inapplicable in that case was because Mr. Monus had no

"evidentiary support" for the allegation that Giant Eagle had participated in the fraudulent

scheme.  We disagree.  From our reading of *Monus*, the Court of Appeals, in affirming the

bankruptcy appellate panel's decision, paid little mind to the fact that Mr. Monus had no

evidentiary support for his allegation against Giant Eagle.  Instead, the Court of Appeals clearly

articulated a distinction between § 523 and § 727:  "[U]nlike an inquiry under a dischargeability

proceeding under § 523, which seeks to vindicate only a single creditor's debt, the inquiry in a

proceeding under § 727(a) is directed toward protecting the integrity of the bankruptcy system

by denying discharge to debtors who engage in objectionable conduct that is of a magnitude and

effect broader and more pervasive than a fraud on a single creditor."  *Id.*  There is no suggestion

that the existence or non-existence of evidentiary support for the allegations of unclean hands is

in any way determinative with respect to the applicability of an unclean hands defense to § 727

actions.

We find the rationale of *In re Monus* to be persuasive and hold that the doctrine of

unclean hands is inapplicable in proceedings seeking to deny discharge under § 727.  We note

that Mr. Prosser, in his brief to the Court, stated that *In re Monus* should not be relied upon

because it is designated as having "limited precedential value."  In fact, it was the bankruptcy

appellate panel's unpublished decision in the case that was designated as "limited precedential

value."[50]  Though unpublished, the Court of Appeals' opinion, affirming the bankruptcy

appellate panel's decision and cited here by the Plaintiffs, does not contain that designation.

Rather, the Court of Appeals concluded that "the appellate panel correctly analyzed and decided

the issues before it."  *In re Monus*, 167 Fed. Appx. at 496.

Furthermore, even if the doctrine of unclean hands were applicable in § 727 proceedings,

the Chapter 7 Trustee's disbursement to the Greenlight Entities would not warrant the

application of that doctrine.  The decision to apply the unclean hands doctrine is discretionary,

and lies with the trial court.  *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245-

46; *Deweese v. Reinhard*, 165 U.S. 386, 390 (1897); *In re New Valley Corp.*, 181 F.3d at 525.

The Third Circuit Court of Appeals has stated that when applying the doctrine of unclean hands,

"the courts in this Circuit have generally been clear that the connection between the misconduct

and the claim must be close . . . ."  *In re New Valley Corp.*, 181 F.3d at 525.  The *New Valley*

*Corp.* court provided examples of instances in the Third Circuit where the doctrine was not

applied.  *Id.*  In *Ciba-Geigy Corp. v. Bolar Pharmaceutical Co.*, 747 F.2d 844, 855 (3d Cir.

1984), the Court of Appeals affirmed a grant of a permanent injunction in favor of Ciba despite

---

[50] *See Giant Eagle, Inc. v. Monus* (*In re Monus*), No. 03-8053, slip op. (B.A.P. 6th Cir.
Sept. 27, 2004).

allegations that Ciba had unclean hands.  The District Court found that, despite evidence that

Ciba mislabeled drugs, sold adulterated batches of drugs, and violated FDA regulations, the

unclean hands defense did not apply because Ciba's bad acts did not relate to its claims against

Bolar.  *Id.*; *Ciba-Geigy Corp.*, 747 F.2d at 855.  Also, in *Northeast Women's Center v.

McMonagle*, 868 F.2d 1342, 1354 (3d Cir. 1989), the Court of Appeals reversed the District

Court's holding that the unclean hands doctrine applied to preclude Northeast from obtaining an

injunction against the defendants because Northeast's alleged violation of health regulations had

no relationship to the defendants' acts in interfering with Northeast's claims.  *New Valley Corp.*,

181 F.3d at 525; *Northeast*, 868 F.2d at 1354.

Here, the Chapter 7 Trustee's disbursement to the Greenlight Entities, one of the estate's

largest secured creditors, has nothing to do with Mr. Prosser's pervasive concealment and

undervaluing of his assets, his failure to tell the truth under oath, or his failure to obey direct

orders of this Court.  As such, the doctrine of unclean hands does not apply in § 727

proceedings, and would not be applied in this case in any event due to the lack of relationship

between the Chapter 7 Trustee's distribution to a secured creditor and the Debtor's numerous

bad acts.  Thus, we turn to the merits of the Chapter 7 Trustee's causes of action under the

various subsections of § 727(a).

### 1.    § 727(a)(2)

Trustee Carroll objects to Mr. Prosser's discharge under § 727(a)(2) based on Mr.

Prosser's transfers of $250,000 and $230,000 into the bank account titled to his wife and

daughter on the day of and the day after the filing of his voluntary bankruptcy petition.  Section

727(a)(2) provides that a debtor shall be granted a discharge unless:

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of
the estate charged with custody of property under this title, has transferred,
removed, destroyed, mutilated, or concealed, or has permitted to be transferred,
removed, destroyed, mutilated, or concealed –

(A) property of the debtor, within one year before the date of the filing of
the petition; or
(B) property of the estate, after the date of the filing of the petition[.]

A plaintiff objecting to discharge under § 727(a)(2)(A) must establish three elements: "(1) a

disposition of property, such as a transfer or concealment; (2) a subjective intent on the debtor's

part to hinder, delay or defraud one or more creditors or the bankruptcy trustee through that

disposition; and (3) that both the disposition and the subjective intent occurred within the one-

year period before the petition was filed." *Wachovia Bank, N.A. v. Spitko* (*In re Spitko*), 357

B.R. 272, 299 (Bankr. E.D. Pa. 2006) (citing *In re Lawson*, 122 F.3d 1237, 1240 (9th Cir.

1997)).  The elements of proof under § 727(a)(2)(B) relating to post-petition fraudulent transfers

are substantially the same, minus the one-year requirement.  *Spyra v. Finney* (*In re Finney*), 333

B.R. 242, 247 (Bankr. W.D. Pa. 2005) ("Two elements must exist before discharge may be

denied under [§ 727(a)(2)(B)] —an act and an improper intent.").

To meet the "disposition of property" requirement, the Court must find that the debtor

transferred or concealed an asset to which the Debtor has a "direct proprietary interest." *In re*

*Spitko*, 357 B.R. at 299.  As discussed, *supra*, in our Findings of Fact, Mr. Prosser's explanation

for these transfers is that he had no interest in these funds, and that they belonged to his wife,

having originated from a settlement check, received from a contractor over work done on the

Shoys Estate, and which was allegedly deposited in Jeffrey and Dawn Prosser's joint account.

However, as stated in our Findings of Fact, we find that explanation lacking in credibility as it

does not comport with the evidence.  The Court finds that Mr. Prosser had a direct proprietary

40

interest in the $250,000 and $230,000 that he transferred to his wife, Dawn Prosser, and

daughter, Michelle LaBennett on July 31, 2006, and August 1, 2006.  Both transfers came from

bank accounts bearing the Debtor's name; the $250,000 transfer from a VICB account the

Debtor held jointly with his wife, and the $230,000 transfer from Mr. Prosser's individual

account at Bank of America.  Both transfers were to an account in which the Debtor held no

interest.

The second element of § 727(a)(2) requires the Court to find that the Debtor had a

subjective intent that the disposition would hinder, delay, or defraud one or more of his creditors

or the bankruptcy trustee.  As the *Spitko* court stated, "because courts recognize that a debtor

will be reluctant to admit that he was motivated by fraud, they have permitted fraudulent intent

to be inferred from circumstantial evidence or a course of conduct."  *Spitko*, 357 B.R. at 301;

*Campbell v. Macartie* (*In re Factory Tire Distribs., Inc.*), 64 B.R. 335, 341 (Bankr. W.D. Pa.

1986).  A continuing pattern of wrongful behavior can be an indication of fraudulent intent.

*Devers v. Bank of Sheridan* (*In re Devers*), 759 F.2d 751, 754 (9th Cir. 1985).  Moreover, the

existence of badges of fraud "strongly suggest that a transaction's purpose is to defraud creditors

unless some other convincing explanation appears."  *Id.* (citing *In re Woodfield*, 978 F.2d 516,

518 (9th Cir. 1992)).  These badges of fraud include: "(1) a close relationship between the

transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that

the transferor Debtor was insolvent or in poor financial condition at the time; (4) that all or

substantially all of the Debtor's property was transferred; (5) that the transfer so completely

depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part

of the judgment; and (6) that the Debtor received inadequate consideration for the transfer."  *Id.*

41

(citations omitted); *see also Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574 (2d Cir. 1983).

Furthermore, "transfers to relatives and associates, accompanied by no proof of consideration,

create a situation in which the court can, and must, infer an intent to hinder creditors." *Aetna*

*Ins. Co. v. Nazarian* (*In re Nazarian*), 18 B.R. 143, 150 (Bankr. D. Md. 1982).

Here, the transfers bear the following badges of fraud.  First, the transfers were made to

family members, specifically Mr. Prosser's wife, Dawn Prosser, and, by virtue of her co-

ownership of the bank account into which they were deposited, her daughter, Michelle

LaBennett.  Mr. Prosser enjoys a familial relationship with both recipients.  Secondly, the timing

of the undisclosed transfers, occurring on the day of and on the day after the filing of his petition,

strongly evince an intent to hinder, delay, or defraud his creditors.  Third, at the time of the

transfers, Mr. Prosser was in poor financial condition, evidenced by the Terms and Conditions of

Settlement of Claims of RTFC, CFC, Prosser Parties, and Greenlight Entities (the "Terms and

Conditions"), which Mr. Prosser signed on April 26, 2006, only months before the transfers at

issue were made.  Prosser Trial Ex. 81.  The Terms and Conditions capped Mr. Prosser's

personal liability for the RTFC Judgment at $100 million.[51]  *Id.*  Lastly, Mr. Prosser received no

consideration in return for these transfers.

Furthermore, despite having an obligation to disclose these transfers, Mr. Prosser failed

to disclose them on his Statement of Financial Affairs, his schedules, or his monthly operating

reports, nor did Mr. Prosser disclose them to the Chapter 7 Trustee.

Given the presence of a significant number of badges of fraud, the Court finds that the

---

[51] The Debtor's schedules do not reflect ownership of assets sufficient to cover a debt of
$100 million.  Trial Exs. TE-2-6.

two transfers of $250,000 and $230,000 were made with the intent to hinder, delay, or defraud creditors of his estate.

Finally, under § 727(a)(2)(A), the Court must find that the transfers occurred within one year prior to the filing of the petition.  Here, the one-year requirement is of no consequence because of the timing of the transfers.  With respect to the $250,000 transfer made on July 31, 2006, (Mr. Prosser's voluntary petition date), we find this transfer occurred within one year before the date of the filing of the petition in violation of § 727(a)(2)(A).  With respect to the second transfer of $230,000 made on August 1, 2006, the Court finds that this constitutes a transfer of property of Mr. Prosser's bankruptcy estate after the petition date, in violation of § 727(a)(2)(B).[52]

In *Lini, Inc. v. Schachter* (*In re Schachter*), 214 B.R. 767, 773-74 (Bankr. E.D. Pa. 1997), § 727(a)(2)(B) violations were found under very similar circumstances.  In that case, the debtor, post-petition, transferred "substantial funds from his individual bank accounts to joint accounts with his wife and to his wife individually. . . . These actions were not disclosed to the Trustee despite his several inquiries . . . ."  *Id.* at 773.  The court denied discharge on the basis of these § 727(a)(2)(B) violations.  *Id.* at 772.

These two undisclosed and concealed transfers totaling $480,000, occurring on the day of and on the day after the filing of Mr. Prosser's bankruptcy petition, were established at trial by

---

[52] As we explained, *supra*, we are continuing to refer to this transfer as having been made on August 1, 2006, as this is the date the funds were received into Dawn Prosser and Michelle LaBennett's VICB bank account.  Even if this transfer was considered to have been made on July 31, 2006, and thus pre-petition, the only effect would be that Mr. Prosser's violation of § 727(a)(2)(B) would become a violation of § 727(a)(2)(A), and thus supports a denial of discharge under § 727(a)(2).

credible, preponderate, and undisputed evidence.  The Court finds that these transfers were made

with an intent to hinder, delay, or defraud creditors of the Debtor's estate.  Furthermore, as noted

above, we find Mr. Prosser's explanation for the transfers lacking in credibility and contrary to

the evidence established at trial.  As a result, pursuant to § 727(a)(2), we deny Mr. Prosser's

discharge.

**2.        § 727(a)(3)**

The Chapter 7 Trustee also objects to the entry of Mr. Prosser's discharge based upon the

Debtor's concealment of various records.  Section 727(a)(3) provides that a debtor shall receive

a discharge unless:

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or
> preserve any recorded information, including books, documents, records, and
> papers, from which the debtor's financial condition or business transactions might
> be ascertained, unless such act or failure to act was justified under all the
> circumstances of the case[.]

The Court of Appeals for the Third Circuit articulated the purpose of § 727(a)(3) in

*Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992):

> "The purpose of section 727(a)(3) is to give creditors and the bankruptcy court
> complete and accurate information concerning the status of the debtor's affairs
> and to test the completeness of the disclosure requisite to a discharge.  The statute
> also ensures that the trustee and creditors are supplied with dependable
> information on which they can rely in tracing a debtor's financial history."

*Meridian Bank*, 958 F.2d at 1230 (citations omitted).  The party objecting to the entry of

discharge under § 727(a)(3) must prove "(1) that the debtor failed to maintain and preserve

adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial

condition and material business transactions."  *Id.* at 1232; *In re Burrick*, 459 B.R. at 890.  The

objecting party does not have to prove that the debtor intended to defraud it to demonstrate a

violation of § 727(a)(3). *Meridian Bank*, 958 F.2d at 1234. Once the objecting party makes an initial showing that the debtor's records are inadequate, the burden shifts to the debtor to provide a justification for the inadequacies. *Id.* at 1233. The debtor "must do more than profess a belief that his records were sufficient or that it was not his practice to keep additional records." *Helms v. Gangemi* (*In re Gangemi*), 291 B.R. 242, 246 (E.D.N.Y. 2003) (internal citations omitted). Violations of § 727(a)(3) must be proven by a preponderance of the evidence, and the objecting party and the debtor bear the burden of persuasion. *In re Burrik*, 459 B.R. at 890 (citations omitted).

As to the adequacy of business records, the records cannot be "(a) 'chaotic or incomplete,' (b) in such a condition that a creditor is 'required to speculate as to the financial history or condition of the debtor,' nor (c) in such a condition that a 'creditor [is compelled] to organize and reconstruct the debtor's business affairs.'" *PNC Bank, N.A. v. Buzzelli* (*In re Buzzelli*), 246 B.R. 75, 96 (Bankr. W.D. Pa. 2000) (internal citations omitted). "The test is whether there is 'available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained.'" *Meridian Bank*, 958 F.2d at 1230 (quoting *In re Decker*, 595 F.2d 185, 187 (3d. Cir. 1979)). Oral testimony is not a valid substitute or supplement for written records. *In re Burrik*, 459 B.R. at 890 (citing *In re Juzwiak*, 89 F.3d 424, 429-30 (7th Cir. 1996)). Sophisticated business people involved in complex financial affairs are held to a higher standard of record keeping. *Meridian Bank*, 958 F.2d at 1231.

The "impossibility requirement" imposed by *Meridian Bank* means that "a creditor, in order to prevail under § 727(a)(3), must demonstrate that the state of a debtor's recorded

45

information is such that a creditor cannot possibly ascertain said debtor's financial condition and

material business transactions without organizing, reconstructing, independently investigating,

and/or accepting oral representations by said debtor regarding said debtor's affairs." *In re*

*Buzzelli*, 246 B.R. at 97.

    In the instant case, the Chapter 7 Trustee seeks a denial of discharge under § 727(a)(3)

based upon Mr. Prosser's (1) concealment of the Marital Property Agreement; (2) concealment

of a will and other estate planning documents; and (3) attempted destruction of personal

computer hard drives.  Proof of any one of these concealments is sufficient as each involves

material information.  The trustee sufficiently proved the concealment of all three documents.

    The credible evidence at trial established that Mr. Prosser executed the Marital Property

Agreement with his wife, Dawn Prosser, a mere twenty-three days before the Greenlight Entities

filed an involuntary bankruptcy petition against Mr. Prosser, and only nine days after Mr.

Prosser learned about the judgment Greenlight obtained against Mr. Prosser.  Mr. Prosser,

however, testified under oath that he had no recollection of the existence of the Marital Property

Agreement.  We find Mr. Prosser's failure to recall the existence of the Marital Property

Agreement to be completely incredible.

    The Marital Property Agreement purportedly "defines [t]he respective financial and

property rights, together with all other rights, remedies, privileges and obligations arising out of

[the] marriage" between Jeffrey and Dawn Prosser.  Trial Ex. TE-90.  As such, the Court finds

the Marital Property Agreement to be a document from which the Debtor's financial condition

could be ascertained and one which constitutes a material transaction relevant to Mr. Prosser's

financial affairs.  There is no justification for failing to disclose the existence of the Marital

46

Property Agreement.  Mr. Prosser's concealment of the Marital Property Agreement hindered the

Chapter 7 Trustee in his effort to ascertain Mr. Prosser's financial condition.  The Chapter 7

Trustee did not know of the Marital Property Agreement's existence until May of 2008, when

the Chapter 11 Trustee came upon it in the storage shed rented by New ICC in West Palm Beach,

Florida, the existence of which was itself concealed from the Trustees.  The Court finds that the

concealment of the Marital Property Agreement constitutes a violation of § 727(a)(3).

Mr. Prosser testified that he did not have a will, yet the credible evidence at trial

established that Mr. Prosser did in fact execute a will.  The will itself was found and admitted

into evidence at trial as Trial Ex. TD-102.  The Court also heard credible testimony from

attorney Donovan Hamm that Mr. Hamm prepared the will, a revocable trust, and other estate

planning documents for Mr. Prosser.  Attorney Peter Weisman also testified that he assisted Mr.

Prosser with creating estate planning documents.  As with the will, Mr. Prosser did not provide

the Chapter 7 Trustee with any written information or documentation regarding the revocable

trust agreement.  Mr. Prosser's denial of the existence of these documents furthered the course of

conduct in concealing material written information from the Chapter 7 Trustee in violation of §

727(a)(3).

Finally, the credible evidence at trial established that Mr. Prosser, without justification,

ordered the destruction of personal computer hard drives located at his residence in Palm Beach,

Florida.  The evidence established that Drive 2 (the drive Mr. Prosser attempted to have

destroyed) contained financial and business information.  The Court finds the removal of Drive 2

from Mr. Prosser's personal computer constitutes a concealment of recorded information from

which the debtor's financial condition or business transactions might be ascertained, in violation

47

of § 727(a)(3).

The Court finds that Mr. Prosser violated § 727(a)(3) by concealing the Marital Property

Agreement, his will, a revocable trust and other estate planning documents, and by attempting to

destroy personal computer hard drives that contained information regarding his financial

condition and business transactions.  We find Mr. Prosser's testimony on these subjects to be

lacking in credibility and against the weight of the evidence established at trial.  As a result,

pursuant to § 727(a)(3), we deny Mr. Prosser's discharge.

**3.        § 727(a)(4)(A), (D)**

The Chapter 7 Trustee objects to the entry of Mr. Prosser's discharge under both §

727(a)(4)(A) and § 727(a)(4)(D), on grounds that Mr. Prosser filed inaccurate schedules and

provided false testimony.  Section 727(a)(4) states that the Court shall grant a debtor's discharge

unless:

> (4) the debtor knowingly and fraudulently, in or in connection with the case–
>     (A) made a false oath or account; [or]
>     . . .
>     (D) withheld from an officer of the estate entitled to possession under this
>     title, any recorded information, including books, documents, records, and
>     papers, relating to the debtor's property or financial affairs[.]

11 U.S.C. § 727(a)(4)(A), (D).  "Section 727(a)(4)(A) 'imposes affirmative duties upon a debtor

to disclose the existence of all assets and his ownership interest in property and to answer all

questions fully and honestly for the benefit of his [or her] creditors and other parties with an

interest . . . in the debtor's bankruptcy case who are entitled to a truthful statement of the

debtor's financial condition.'" *Scimeca v. Umanoff*, 169 B.R. 536, 542 (D.N.J. 1993), *aff'd*, 30

F.3d 1488 (3d Cir. 1994) (Table) (quoting *In re Henderson*, 134 B.R. 147, 159 (Bankr. E.D. Pa.

1991)).  The objecting party must prove two elements in order for discharge to be denied under §

727(a)(4)(A): "(1) the debtor knowingly and fraudulently made a false oath; and (2) the false

oath related to a material fact." *Id.* (citing *In re Roberts*, 81 B.R. 354, 381 ( Bankr. W.D. Pa.

1987)).

The objecting party must establish a violation of § 727(a)(4)(A) by a preponderance of

the evidence. *Krywopusk v. Raftogianis* (*In re Raftogianis*), 2012 WL 2885469, *5 (Bankr. E.D.

Pa. July 13, 2012) (citing *In re Georges*, 138 Fed. Appx. 471, 472 (3d Cir. 2005). Once the

objecting party meets the initial burden of proof, and it "reasonably appears that the oath is false,

the burden falls upon the bankrupt to come forward with evidence that he [or she] has not

committed the offense charged." *Id.* (quoting *In re Tully,* 818 F.2d 106, 110 (1st Cir. 1987)).  An

intent to deceive may be inferred from a series or pattern of errors or omissions. *Office of the*

*U.S. Tr. v. Zimmerman* (*In re Zimmerman*), 320 B.R. 800, 811 (Bankr. M.D. Pa. 2005).

Furthermore, the "requisite degree of fraudulent intent is shown if the debtor 'engaged in

behavior which displayed a reckless and cavalier disregard for the truth.'" *Sousa v. Old*

*Republic Nat'l Title Ins. Co.* (*In re Sousa*), 2008 U.S. Dist. LEXIS 7352, at *16-*17 (D.N.J. Jan.

30, 2008) (quoting *Isaacson v. Castiglione* (*In re Castiglione*), 2007 Bankr. LEXIS 1316, at *10

(Bankr. D.N.J. Jan. 30, 2007) (citations omitted)).

With respect to the first element of § 727(a)(4)(A), "a false oath may be enough to

sustain a denial of discharge when: (1) the false statement or omission occurs in the debtor's

schedules, or (2) the false statement was made by the debtor at an examination during the course

of the proceedings." *Scimeca*, 169 B.R. at 542 (quoting *In re Tarle*, 87 B.R. 376, 379 (Bankr.

W.D. Pa. 1988)).

A false oath is material "if it bears a relationship to the bankrupt's business transactions

49

or estate, or concerns the discovery of assets, business dealings, or the existence and disposition

of . . . property.  A false oath may be considered material even if it did not result in any detriment

to a creditor or the debtor." *In re Sousa*, 2008 U.S. Dist. LEXIS 7352, at *19 (internal quotation

and citation omitted).  *See also Job v. Calder* (*In re Calder*), 907 F.2d 953, 955 (10th Cir. 1990)

(quoting *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)); *Cont'l Bank v. Bobroff* (*In re

Bobroff*), 69 B.R. 295, 297 (E.D. Pa. 1987) ("It is well established that a debtor's declaration that

his schedule of property is 'true and correct' constitutes an adequate ground for disallowance of

discharge where the debtor has knowingly and fraudulently omitted assets from the schedule.").

Here, there is no question that Mr. Prosser's schedules, which he amended five separate

times (four of which are at issue), each time upon the discovery of an undisclosed asset by

creditors or the trustees, are replete with inadequate, incomplete, and false disclosures, and

numerous inaccuracies.  Given the pattern of errors, omissions, and significant

mischaracterization and substantial undervaluation of many of his assets, the Court finds that Mr.

Prosser filed his schedules in bad faith and with blatant dishonesty, in conscious disregard for his

duties as a debtor.  Furthermore, we find that Mr. Prosser filed his schedules with the intention of

deceiving any party, including the Chapter 7 Trustee, who would review his schedules, as to the

true nature of his assets and liabilities.

Specifically, and as set forth in the Findings of Fact, we find that Mr. Prosser knowingly

and fraudulently (1) failed to disclose hundreds of bottles of wine with an aggregate value in the

millions of dollars until after the wines were discovered by the Chapter 7 Trustee; (2) failed to

disclose valuable watches, jewelry, and a Bernard Passman chalice; (3) failed to disclose a cigar

collection with an aggregate value in the thousands of dollars; (4) failed to disclose his interest

as an officer of AMJ, Inc.; (5) even after listing assets in his original and amended schedules,

significantly undervalued assets including the Lake Placid Home, the wine collection, jewelry

and watches, and his VICB stock; and (6) failed to disclose the existence of storage space in

West Palm Beach, Florida, containing personal property and undisclosed records (including the

Marital Property Agreement) related to the bankruptcy.  Mr. Prosser failed to offer any credible

explanation for his numerous omissions and untruthful testimony.

The sheer number of material omissions, undervaluations, and mischaracterizations with

respect to his bankruptcy schedules are prima facie evidence of the Debtor's complete and utter

disregard for the truth.  The Court finds that Mr. Prosser's repeated failures to correctly list his

assets on his schedules, despite numerous amendments, are not the result of innocent mistake.

The false oaths made by Mr. Prosser in this regard are clearly material, as he undervalued his

assets in the aggregate by millions of dollars.  Furthermore, Mr. Prosser's repeated failures with

respect to his schedules has significantly slowed the administration of the bankruptcy estate and

caused the Chapter 7 Trustee to undergo substantial independent effort to discover the true

picture of Mr. Prosser's financial condition.  This situation is specifically what § 727(a)(4)(A) is

meant to avoid.  *See Cadle Co. v. Zofko*, 380 B.R. 375, 383 (W.D. Pa. 2007).  Pursuant to §

727(a)(4)(A), the Court denies the Debtor's discharge.

Section 727(a)(4)(D) provides that a debtor's discharge will be denied if the debtor

withholds recorded information related to the debtor's property or financial affairs from an

officer of the estate.  As is required by § 727(a)(4)(A), under § 727(a)(4)(D) there must be a

showing that recorded information was withheld knowingly and fraudulently by the debtor.

Producing previously withheld documents after their independent discovery by the Trustee does

51

not divest Mr. Prosser of his obligations under § 727(a)(4)(D) or excuse his concealment of the information.  *In re Roberts*, 81 B.R. at 381 (denying debtor's discharge on the basis of § 727(a)(4)(D) because "debtor has made a practice of withholding documents, and reluctantly relinquishing same, only when caught").

As noted above, the Marital Property Agreement was independently discovered by the Chapter 7 Trustee in a storage unit in West Palm Beach, Florida, which itself was not disclosed by Mr. Prosser.  Furthermore, even after the Chapter 7 Trustee discovered the existence of the Marital Property Agreement in the storage unit, Mr. Prosser failed to produce the document and the Court eventually compelled its production pursuant to a motion from the Chapter 7 Trustee.

We find that Mr. Prosser knowingly and fraudulently withheld the Marital Property Agreement from the Chapter 7 Trustee.  Mr. Prosser's testimony as to the Marital Property Agreement simply cannot be reconciled with the facts.  During his deposition in connection with the Exemptions Trial, and then later during his testimony at the Exemptions Trial, Mr. Prosser testified that he could not recall entering into the Marital Property Agreement.  Contradicting this testimony, Mr. Prosser went on to explain in great detail the impetus for creating the Marital Property Agreement; *i.e.*, the agreement was entered into to alleviate his wife's concern over the Greenlight judgment and the ongoing lawsuits with the RTFC.  Given the timing of the execution (nine days after the entry of the Greenlight judgment and mere weeks before Mr. Prosser was forced into bankruptcy by his creditors), and Mr. Prosser's detailed testimony about the origins of the Marital Property Agreement, the Court finds Mr. Prosser's testimony that he did not recall the existence of a written agreement with his wife to be completely lacking in credibility.

52

Given that the Marital Property Agreement purports to define the "respective financial and property rights, together with all other rights, remedies, and privileges and obligations arising out of the marriage,"[53] the document clearly relates to Mr. Prosser's property and financial affairs.  The Marital Property Agreement reflects Mr. Prosser's effort to voluntarily relinquish various assets to his wife, for no consideration, and thus, is material to the administration of his estate.  Mr. Prosser's failure to produce this document until after the Court ordered him to do so was in violation of § 727(a)(4)(D).[54]

**4.      § 727(a)(6)(A)**

Section 727(a)(6)(A) states that a debtor's discharge shall be granted unless:

> (6) the debtor has refused in the case–
>         (A) to obey any lawful order of the court, other than an order to respond to a material question or to testify[.]

The refusal to obey a court order must be willful and intentional in order to support a denial of discharge.  *Stapleton v. Klika* (*In re Klika*), 2007 Bankr. LEXIS 856, at *6 (Bankr. D. Del. Mar. 16, 2007) (citing *Wilmington Trust Co. v. Jarrell* (*In re Jarrell*), 129 B.R. 29, 33 (Bankr. D. Del. 1991)).  Factors to consider regarding whether a failure to obey a court order justifies a denial of disharge include "the intent behind the debtor's acts, whether the acts were willful, whether there was a justifiable excuse, whether there was injury to creditors and whether there is some way the

---

[53] Trial Ex. TE-90 (Marital Property Agreement).

[54] Furthermore, the approximately eleven boxes of documents, discovered by the Chapter 7 Trustee in the storage unit (itself undisclosed), should also have been turned over to the Chapter 7 Trustee as they were responsive to previously propounded discovery requests.  Mr. Prosser also knowingly and fraudulently failed to provide his bank records to the Chapter 7 Trustee despite repeated requests to do so.  The Court finds that the withholding of this recorded information constitute further violations of § 727(a)(4)(D).

debtor could make amends.  *Id.* (citing *Skilled Nursing Home Care, Inc. v. Juris* (*In re Juris*),

1997 Bankr. LEXIS 1722, at *3 (Bankr. E.D. Pa. Oct. 28, 1997)).

Mr. Prosser blatantly disobeyed the Cooperation Order by failing to provide immediate,

full, complete, and unfettered access to New ICC's books and records.  This failure was

established by credible evidence at trial, and no justifiable excuse has been offered by the

Debtor.  The failure to comply with the Cooperation Order is a violation of § 727(a)(6)(A).  *See*

*id.*; *Landes v. Landes* (*In re Landes*), 201 B.R. 399, 405-10 (Bankr. E.D. Pa. 1996) (denying

discharge based on "gross violations of §§ 727(a)(7), (a)(6)(A)" where the debtor failed to obey

a consent decree entered in a related corporate bankruptcy case by refusing to cooperate with the

trustee and, in particular, denying the trustee access to certain storage areas).

In addition, Mr. Prosser violated the Cooperation Order by attempting to destroy the hard

drives on his personal computers located at his Palm Beach residence.  By instructing Mr.

Stelzer to have the hard drive cleaned, and by replacing the drive with a new hard drive, Mr.

Prosser blocked the Chapter 7 Trustee's access to the corporate files located on the old hard

drive (Drive 2), in violation of the Cooperation Order and § 727(a)(6)(A).  *See D'Agnese v.*

*Cotsibas* (*In re Cotsibas*), 262 B.R. 182, 185-86 (Bankr. D.N.H. 2001) (granting summary

judgment and denying discharge under § 727(a)(6)(A) where debtor failed to comply with

discovery order).[55]  Thus, pursuant to § 727(a)(6)(A), the Court will deny Mr. Prosser's

discharge.

---

[55] Finally, while Mr. Prosser's failure to obey the Cooperation Order is sufficient for a
denial of discharge under § 727(a)(6)(A), the Court notes again that Mr. Prosser, along with his
wife, were held in civil contempt of court on September 18, 2012, for failing to obey and adhere
to the Injunction issued by this Court, which required both the Debtor and Dawn Prosser to
preserve and maintain the wine collection.

## CONCLUSION

For the foregoing reasons, the Court sustains the Chapter 7 Trustee's objection to the entry of Mr. Prosser's discharge under § 727(a)(2), (a)(3), (a)(4)(A), (a)(4)(D), and (a)(6)(A). The Court notes that a violation of any one of these subsections is sufficient to deny discharge under § 727. Due to the overwhelming evidence that established a pattern of egregious conduct exhibited by the Debtor over many years in this bankruptcy case, the Court felt it appropriate to analyze all of the Chapter 7 Trustee's asserted bases for denial of discharge.[56] Inasmuch as this Opinion and accompanying Order will moot the need to examine the remaining Discharge

---

[56] In his complaint, the Chapter 7 Trustee also alleged violations under § 727(a)(5) and § 727(a)(7). Adv. Pro. No. 08-3011, Doc. No. 1. However, the Trustee failed to set forth findings of fact and conclusions of law on those claims, and thus, the Court considers the Chapter 7 Trustee to have waived or abandoned those claims. *See, e.g.*, *Askew v. City of Rome*, 127 F.3d 1355, 1373 n.4 (11th Cir. 1997); *Christen G. by Louise G. v. Lower Merion School Dist.*, 919 F. Supp. 793, 799 (E.D. Pa. 1996). The waiver of the claims under § 727(a)(5) and (7) does not affect this Court's determination that Mr. Prosser's discharge must be denied. The Court notes that to the extent the other Plaintiffs in the remaining Discharge Adversary Proceedings raised claims under § 727(a)(5) and (7) in their complaints, and also set forth proposed findings of fact and conclusions of law as to those claims, the Court does not consider the other Plaintiffs to have waived or abandoned those claims. However, because this Opinion addresses only the Chapter 7 Trustee's complaint, the claims under § 727(a)(5) and (7) are not addressed herein.

55

Adversary Proceedings, rulings therein are deferred until this Order becomes final.

An appropriate order will be issued consistent with this Opinion.

Date: _December 20, 2012_

Judge Judith K. Fitzgerald
United States Bankruptcy Court

56